Douglass CARMICHAEL, Appellant,

v.

Fredrica CARMICHAEL, Appellee.

No. 89–1524.

District of Columbia Court of Appeals.

Argued Jan. 17, 1991.

Decided Oct. 15, 1991.

Douglas J. Colton, with whom Don C. Lewis, Washington, D.C., was on the brief, for appellant.

Robert L. Weinberg, with whom David Povich and George A. Borden, Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and WAGNER, Associate Judges.

ROGERS, Chief Judge:

In this appeal from a judgment of divorce and medical malpractice, appellant

Douglass Carmichael contends that the trial judge erred in finding that appellant's malpractice caused harm to appellee Fredrica Carmichael, and that the judge abused his discretion in distributing the marital property. We agree that the evidence of causation was insufficient to support a finding of malpractice. Accordingly, we reverse the judgment for appellee on the malpractice claim; otherwise we affirm.

## I.

The trial judge, sitting as trier-of-fact, found that in January 1982, appellee Fredrica Carmichael (then Fredrica Saunders) first scheduled an appointment to see appellant Douglass Carmichael, a licensed psychologist. She sought his professional assistance in connection with personal problems stemming from her "excessive preoccupation" with her son, who was away at college. Appellee was referred to appellant by Richard Saunders, then her husband, who had been a patient of appellant several years earlier. At the conclusion of her first visit, appellant said, "did it ever occur to you that you're not here about [your son] at all but about yourself?" Appellee agreed to regular meetings twice a week.[1]

After a course of treatment for approximately three months, appellant informed appellee that on April 6, 1982, her marriage with Richard was flawed, and that she should consider separating from him. Prior to this, although she was not completely happy in her marriage, appellee had never considered leaving Richard. That evening, after arguing with her husband, appellee became very upset and ran out in the street dressed only in a leotard.

Appellee walked to appellant's nearby house, saw lights on, and rang the bell. Appellant answered, and took her upstairs to his office, where she had met him for all of her previous therapy sessions. After appellee explained what had happened with Richard, appellant led her across the hallway into his bedroom, comforted her, and put her in bed. He then had sexual relations with her, which she did not resist.

The next morning appellee was very distraught. Appellant told her that he loved her and wanted to marry her. When appellee said that she was married to Richard Saunders, appellant explained that Richard did not really love her and that she should divorce him. On appellant's advice, appellee went home and told Richard that she could stay married to him only if he would be willing to adopt a child. Richard responded that an ultimatum was not a good basis for a marriage, and walked out.

Appellee went to see appellant for her next regular therapy session, and appellant informed her that she should quickly work out a divorce settlement with Richard. Although appellee was not sure if she loved appellant at this point, he seemed to understand her and know things about her that she did not know herself. She followed his advice, and promptly arranged to divorce Saunders.[2]

Appellant and appellee resumed sexual relations after appellee's separation from Richard became final on April 16, 1982. They also continued to meet for therapy, increasing to three times per week. By late April, appellee and appellant had decided to marry. Her family disapproved and insisted on an antenuptial agreement to protect appellee's assets. Appellant agreed to sign the pre-nuptial agreement, drafted by appellee's attorney, which specified that all jointly titled property would be subject to equitable distribution in the event of divorce.

1. Shortly before meeting appellee, appellant had remarked to a friend that "what he really needed was a wealthy woman to marry." As the trial judge found, appellant was facing financial problems and desired to live an elegant life. Appellant was aware that appellee was an heiress.

2. Around this time, appellant made certain entries in his journal indicating concern over his actions. His writings contain a question asked him by his own therapist and friend, Dr. Michael Maccoby, "Can [Richard Saunders] sue for alienation of affection?" Another diary entry concerns appellee: "I've underestimated the possibility of legal/financial/professional sanctions. Here is my vulnerability."

Although at first appellee was happy in her new marriage, her mental and physical condition gradually worsened. Her friends and family noticed that she became gaunt, emaciated and pale. She was depressed, and spoke of herself pejoratively, saying that appellant was "far too brilliant for her," although she herself had a doctorate in English literature. By early 1986, appellant concluded that their therapy was not going well, as appellee's depression deepened, and he referred appellee to Ms. Evelyn Nef, another therapist. Appellant consulted with Ms. Nef about appellee as a "co-therapist." Despite her new therapy, however, appellee's depression worsened in 1987 and 1988, culminating in suicidal feelings.[3]

There also was evidence that appellee had an unhappy childhood resulting largely from her father's indifference, if not hostility, and her mother's efforts to keep hidden from her husband, appellee's father, the fact that appellee was hard of hearing. Further, Ms. Nef testified that appellee had a strained relationship with her parents after she became an adult, feeling alienated from them, and lived a life that was separate from them and different as well in style, appellee choosing a life in academia and a standard of living inconsistent with her wealth. Appellee's first marriage, according to Ms. Nef's testimony, had enabled appellee to get away from her father's abuse, and resulted in divorce after fifteen years. Her second marriage, to Richard Saunders, in which there was very little feeling, according to Ms. Nef, ended after fourteen years. She separated from appellant after five years, and (according to Ms. Nef) appellee was discharging some

of her anger against her father onto appellant. Ms. Nef further testified that appellee's conduct toward appellant, always trying to please him, is typical of someone who has been abused earlier in life. Appellee also suffered some distress when her mother died in 1986, but the judge credited appellee's testimony that "she made her peace with that matter and it held no continuing terror for her, as did her relationship with [appellant]."

The judge found that in April 1987 appellant wanted to invest some of appellee's inheritance money with Ralph Lowenberg, an investment counselor. Appellee had resisted, because she did not like Lowenberg. Appellant kept pressing her nonetheless, and she (for the first time) "began to feel that [appellant] was coercing her about financial matters."[4] In the spring of 1988, appellee discovered that appellant had arranged—again against appellee's express wishes—to purchase with appellee's funds a condominium for appellant's son by a previous marriage. Appellee became quite angry, and moved out of the house. They separated shortly thereafter.

Appellant filed for divorce on October 10, 1988, and appellee counterclaimed for annulment and medical malpractice. By agreement of the parties, the divorce and malpractice claims were tried jointly before the trial judge. At trial, appellee introduced expert testimony in addition to lay testimony regarding the nature of the malpractice and resulting injury. Appellant countered with his expert and lay witnesses. Following the trial, the judge granted the divorce, distributing virtually all of the jointly titled property to appellee, and

---

**3.** Some of appellee's contemporaneous writings in 1987 and 1988 demonstrate the depths of her depression:

> I should be dead. I want to be dead. I'm messing up the beauty of the world by existing in it.
> I am so hateful and horrible and mean and ugly and cruel and stupid and selfish and insensitive and uncaring—How does Douglass stand it?

**4.** Prior to the marriage with appellant, appellee had lived relatively frugally. After her relationship with appellant began, at appellant's urging they used her money to buy an expensive new

home in the city, do extensive remodeling, and entertain many people. For example, after hiring one landscape architect and spending $100,000 to create a garden filled with flowers, they bulldozed the area and spent another $500,000 for a garden composed of "wild grasses" and other accessories. In addition, with appellee's money, they bought homes in Massachusetts and Maine, art and furniture, and many cars. In 1986, at appellant's suggestion, appellee rewrote her will leaving almost her entire estate to him. She later revised her will in favor of appellant and her son by her first marriage.

found for appellee on the malpractice claim, awarding her compensatory and punitive damages.

### III.

"In a medical malpractice case the plaintiff must prove, generally through expert testimony, that there was an applicable standard of care, that the defendant breached that standard, and that the breach was a proximate cause of the plaintiff's injuries."[5] *Psychiatric Inst. of Washington v. Allen*, 509 A.2d 619, 623–24 D.C. (1986). (citations omitted). Appellant contends that appellee failed to present sufficient evidence that any malpractice had caused her harm. We agree.[6]

■■■ Because causation in a medical malpractice case is " 'distinctly related to some science, profession, or occupation,' expert testimony is usually required to establish [it], except where the proof is so obvious as to lie within the ken of the average lay" factfinder. *Washington v. Washington Hosp. Center*, 579 A.2d 177, 181 (D.C.1990) (citations omitted). Hence, the trial judge could not "rely[ ] on common knowledge and experience," *Meek v. Shepard*, 484 A.2d 579, 581 n. 4 (D.C.1984), in finding that appellee's psychological injuries resulted from appellant's conduct. The issue of whether appellee's problems stemmed from appellant's malpractice, as opposed to other factors, "present[s] medically complicated questions due to multiple and/or preexisting causes," requiring expert testimony on the issue of causation. *Baltimore v. B.F. Goodrich Co.*, 545 A.2d 1228, 1231 (D.C.1988). Other factors were present, as is clear from the trial judge's findings of fact and conclusions of law, and expert medical evidence was required to establish causation.

■■■ An examination of the record shows that appellee failed to present expert testimony that demonstrated "a causal relationship between [the malpractice] and [her] injury." *Washington v. Washington Hosp. Center, supra*, 579 A.2d at 181. Appellee relies on the testimony of Dr. Doyle, an expert witness who testified that a patient often "transfers" feelings to the therapist. In particular, Dr. Doyle opined in response to a series of hypothetical questions that a younger female patient like appellee can be expected to see her therapist as a father figure. He explained that introducing sexual relations into such a relationship is "fundamentally ... a betrayal of the patient, because the very essence of trust in psychotherapy is that impulses will not be acted on" and because "sexual relations with a father figure are entirely inappropriate."

Although Dr. Doyle's testimony could support a finding that appellant violated the applicable standard of care, at no point did the doctor testify, "to a reasonable degree of medical certainty, that the [malpractice] 'played a substantial part in bringing about' " appellee's injuries. *Baltimore v. B.F. Goodrich Co., supra*, 545 A.2d at 1231–32 (footnote and citations omitted). After a lengthy hypothetical question, describing appellee's sexual relations with appellant during her therapy, Dr. Doyle was asked about appellee's symptoms:

Q [by appellee's counsel]: Would it be in keeping with the results of this [previously described] situation for [appellee] to have had, as she has testified, depression, distraughtness, even reaching a point of suicide?

A [by Dr. Doyle]: That sequence is a well known and common one in these situations; yes.

Q: Would it be in keeping with such results if [appellee], as she testified, had found herself almost immediately totally dependent, totally trusting of [appellant], submissive to him, dominated by him, almost from the outset of the sexual relations?

---

5. *See Simmons v. United States*, 805 F.2d 1363, 1365–66 (9th Cir.1986) (courts uniformly regard mishandling of transference as malpractice or gross negligence) (citations omitted).

6. In view of our disposition of the causation issue, we do not decide appellant's other contentions regarding the malpractice claim.

A: Again, that is a common scenario in these cases.

Q: Would it be in keeping if, as she has testified, that this state continued for five whole years?

A: That has been known not only to occur, but that state of dependency and submission has lasted longer than that in some individual cases.

Thus, Dr. Doyle's testimony about causation was limited to whether appellee's symptoms were "in keeping" with the transference abuse phenomenon, or whether her distress was of the type "commonly" experienced by victims of transference abuse. Such testimony falls short of establishing causation. The court has described subtly different formulations for what is required of an expert opinion on causation. *See, e.g., Baltimore v. B.F. Goodrich, Co., supra,* 545 A.2d at 1232 (expert must say, "to a reasonable degree of medical certainty, that [the malpractice] played a substantial part in bringing about" the injury); *Psychiatric Institute of Washington v. Allen, supra,* 509 A.2d at 624 (expert must state, "based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries"); *Clifford v. United States,* 532 A.2d 628, 640 n. 10 (D.C.1987) (the "standard of 'reasonable' medical certainty, reflects an objectively well founded conviction that the likelihood of one cause is greater than any other...."). Dr. Doyle's testimony, however, fails under any of the formulations. Although an expert need not say the magical phrase of "reasonable medical certainty," the content of the testimony must make it clear that the expert is doing more than merely speculating about causation. Dr. Doyle's testimony that appellee's symptoms were of the sort commonly associated with transference abuse is simply insufficient.

Dr. Doyle was never asked, as he was with regard to the existence of the therapy relationship and the standard of care and its breach, whether in his opinion appellee's injuries were caused to a reasonable medical certainty by appellant's malpractice.[7] Instead, the doctor was asked to describe the nature of transference, its inevitability in a marriage, and the delayed effect on an older woman patient of a male doctor's betrayal of trust by having sexual relations with the patient. All of the effects that he described as arising from this betrayal of trust he testified were consistent with what had happened to appellee. However, on cross-examination the doctor testified that appellee's symptoms—depression, distress, even suicidal feelings—could have resulted from other causes, including her troubled childhood and relationship with her mother and complicated feelings about her father. Dr. Doyle admitted that appellee, having no outlet for her anger, would experience a troubled period of grieving after her mother died and that her anger could have been turned inward, leading even to suicide. In other words, the symptoms identified as consistent with appellant's malpractice were also consistent with the symptoms arising from other circumstances connected with appellee's childhood and relations with her parents. Under these circumstances, Dr. Doyle's testimony does not reflect a sufficiently certain opinion that the malpractice caused appellee's psychological injuries.

Nor did appellee present other evidence to support causation. Appellant's letter to appellee that he "made [her] doubt [her] own sanity" does not demonstrate causation by reason of his medical malpractice. Both Dr. Doyle and Ms. Nef agreed that marriage could make appellee's situation worse. Appellee's contemporaneous writings (including statements such as "I should be dead. I want to be dead....

---

7. For example, appellee's counsel asked Dr. Doyle whether "in [his] opinion, within a reasonable degree of medical certainty, ... a therapist/patient relationship commenced" between appellant and appellee. Counsel also asked Dr. Doyle whether he had "an opinion to a reasonable degree of medical certainty whether [appel-

lant's conduct] is contrary to the standard of care required by a psychologist practicing as a therapist in the District of Columbia." On other occasions as well, counsel for appellee asked Dr. Doyle questions including the phrase "reasonable degree of medical certainty."

I'm filthy") show that she was deeply depressed, but do not pinpoint a cause for her suffering; Dr. Doyle testified only that the writings strongly suggested that she was depressed, directing her anger inward and not blaming appellant. Further, Ms. Nef's testimony that appellee had "discharg[ed] some of her father anger onto [appellant]" is equally insufficient, particularly in view of Ms. Nef's testimony, in response to the trial judge's question, that appellee's depression and sadness stemmed from both her early childhood experiences and her marriage to appellant. While lay testimony could support a finding that appellee was depressed and withdrawn during her marriage to appellant, there was no expert testimony to support a finding that appellant's breach of the standard of care, by having sexual relations with his patient, was a substantial cause, or more likely than anything else to have been a cause of appellee's injuries. In view of Dr. Doyle's testimony that the phenomenon of transference is inevitable in marriage, testimony that appellee's symptoms were consistent with malpractice was not enough. The doctor did not testify that such symptoms were inevitable, only that they were "well known and common" in such situations. Further, he agreed that other events in appellee's life could have produced the same injuries.

Accordingly, the judgment for appellee on the malpractice claim is reversed; in all other respects the judgment is affirmed.[8]

---

8. We find no merit, given the totality of circumstances, to appellant's contention that the trial judge abused his discretion in distributing the marital assets. *See Powell v. Powell*, 457 A.2d 391, 393 (D.C.1983); *Murville v. Murville*, 433 A.2d 1106, 1110 (D.C.1981). The trial judge considered the relevant factors. D.C.Code § 16– 910(b) (1989). We reject appellant's claim of judicial bias based solely upon events which occurred in the courtroom. *See Browner v. District of Columbia*, 549 A.2d 1107, 1113 (D.C.1988); *Burt v. First American Bank*, 490 A.2d 182, 187 (D.C.1985).