**William R. BOND, Appellant,**

**v.**

**Lesley Ann IVANJACK, Appellee.**

**No. 98–CV–58.**

District of Columbia Court of Appeals.

Argued Oct. 14, 1999.

Decided Nov. 18, 1999.

Alfred F. Belcuore, Chevy Chase, MD, for appellant.

Dean E. Swartz, Washington, DC, for appellee.

Before STEADMAN, SCHWELB and REID, Associate Judges.

REID, Associate Judge:

This case presents a challenge to the trial court's disposition of a post-trial motion relating to a multi-million dollar jury verdict in a medical malpractice case involving the diagnosis of nasopharyngeal cancer. The trial court denied appellant, Dr. William R. Bond's motion for judgment as a matter of law or for a new trial, but granted his motion for remittitur by reducing the $2,206,000.00 verdict on behalf of appellee, Lesley Ann Ivanjack, to $1,506,000.00. On appeal, Dr. Bond contends that the trial court erred by denying his motion for judgment as a matter of law or for a new trial because: (1) the jury's award was based on surmise and speculation as manifested by a lack of legally sufficient evidence on causation; (2) the rules requiring expert testimony and substantial evidence should have been applied strictly; and (3) "the [trial] court's finding that the jury was motivated by 'passion and bias' requires a new trial," as does the jury's excessive award. We affirm.

## FACTUAL SUMMARY

The testimony presented at trial in this case reveals the following facts. In April 1991, Ms. Ivanjack, who was then twenty-one years of age, complained of pain and loss of hearing in her right ear. Her primary care physician at her health maintenance organization ("HMO") diagnosed her condition as an ear infection and placed her on antibiotics. In late May 1991, Ms. Ivanjack was referred to Dr. Bond, an otolaryngologist who was employed by her HMO. Dr. Bond examined Ms. Ivanjack on June 5, 1991 and agreed with the ear infection diagnosis, noting that she "presented with a persistent otitis media with effusion." He continued the antibiotic treatment. Although Dr. Bond insisted that he had used a light and mirror technique to look at Ms. Ivanjack's nasopharynx on June 5 and July 10, 1991, he acknowledged at trial that his medical records reflected no examination of the nasopharynx, and further that he did not

use a nasopharyngeal scope. On June 12, 1991, Ms. Ivanjack returned to Dr. Bond, asserting that her pain had grown worse. Finding no relief, Ms. Ivanjack visited Dr. Bond again on July 12, 1991. She testified that the pain in her right ear "had also spread into the side of [her] neck, [and her] throat. The whole side of [her] head was like on fire." Dr. Bond noted that Ms. Ivanjack had "acute tonsillitis. She had a fet[i]d odor, she had a sore throat, she had enlarged lymph nodes, her tonsils were big, [and] she had tender nodes." He performed a tonsillectomy on July 23, 1991 but Ms. Ivanjack experienced no relief, and her pain became worse. She even took "handfuls" of Advil in an attempt to alleviate the pain. On August 7, 1991, Ms. Ivanjack saw Dr. Bond who dismissed her complaints of pain, assuring her that the pain was not uncommon and would "resolve." He again observed the enlarged lymph node in her neck and told her to return in a month.

Ms. Ivanjack's employer, Dr. Parker T. May, described her health in the Summer of 1991 following her tonsillectomy: "[S]he was in very sad shape. She was exhausted, she was in tremendous pain, she was virtually cringing." When the pain got even worse and Ms. Ivanjack could not get an appointment with Dr. Bond, she returned to her primary care physician at the HMO who ordered a CAT scan, and later referred her to Dr. Zafar Iqbal, another ear, nose and throat specialist ("ENT specialist"). On September 4, 1991, Dr. Iqbal performed a biopsy of tissue removed from Ms. Ivanjack's neck. Other specialists also examined Ms. Ivanjack. On September 13, 1991, Ms. Ivanjack was informed that she was suffering from nasopharyngeal cancer. She was further told that she "had a 15 percent chance of living." She immediately underwent chemotherapy and radiation treatment in accordance with her doctor's recommendation. At the time of trial, she had been free of cancer for a six year period. Nonetheless, she testified to her fear of a recurrence: "Because the cancer

was diagnosed later, my perception is that it is likely that I will have a reoccurrence. And if indeed I do, it's unlikely that I will survive the reoccurrence." She also said: "Because of my cancer and the severity of it, I understand that there is a chance that I will have a reoccurrence. Because of that reoccurence, I am not going to have children or adopt children."

Dr. Cedric Quick, Ms. Ivanjack's expert, who is an otolaryngologist, or an ENT specialist, testified that by September 1991, Ms. Ivanjack's cancer had become a Stage IV tumor in that it had invaded the bone in the neck area. He further stated that Dr. Bond did not meet the standard of care on the occasions he examined Ms. Ivanjack, primarily because of his failure to do "either a visualization of the nasopharynx [with a nasopharyngoscope or a light and mirror] . . . or a test like a CAT scan." Had Dr. Bond used these techniques, Dr. Quick opined "to a reasonable degree of medical certainty," that "the observing otolaryngologist would have seen a [Stage II] tumor mass in the nasopharynx" in June 1991. The eighty-one to eighty-four day delay in diagnosis between June 5, 1991 and September 13, 1991 "was unacceptable in general standards of care" and "the tumor itself grew and the spread of the tumor occurred." Moreover, even after six years of remission, Ms. Ivanjack "still faces for the next five or ten years a risk of relapse from the disease that . . . was treated in September of 1991." She "will need continued and repeated observations for a reoccurrence of [her cancer]." Indeed, in 1997, an abnormality was detected on her CAT scan, but after further investigation, was determined not to be malignant. In terms of Ms. Ivanjack's chances of survival, Dr. Quick expressed the view that had her cancer been diagnosed at Stage II in June 1991, her "chance of surviving five years is high" because sixty-five percent of patients diagnosed at Stage II would survive for five years without a recurrence. In contrast, only ten percent of the patients diagnosed

at Stage IV would be tumor free after five years. In addition, "less than five percent [of those diagnosed at Stage II] will get into problems" after ten years, but "three to four times as many [Stage IV patients] get into trouble."

Another of Ms. Ivanjack's experts, Dr. Bruce Romanczuk, an ENT specialist and an otolaryngologist, conducted a review of Ms. Ivanjack's medical records. His videotape deposition was shown to the jury at trial. In his opinion, Dr. Bond did not meet the standard of care owed to Ms. Ivanjack because he should have suspected nasopharyngeal cancer in June or July 1991, and should have evaluated or had a biopsy done on the nasopharynx. Moreover, Dr. Bond did not properly evaluate the lymph node, nor order imaging studies in response to Ms. Ivanjack's persistent complaints, nor provide the proper postoperative care following her tonsillectomy. Dr. Romanczuk saw no evidence in Ms. Ivanjack's medical records that Dr. Bond ever examined her nasopharynx. According to him, had the proper standard of care been met, Ms. Ivanjack's cancer would have been diagnosed in June 1991, instead of being delayed by almost three months.

Dr. Bond presented the testimony of Dr. Richard Lee Fields, a retired otolaryngologist who reviewed Ms. Ivanjack's medical records. Under the assumption that Dr. Bond examined Ms. Ivanjack's nasopharynx in June or July 1991, he opined that Dr. Bond met the standard of care owed to her. Nonetheless, he expressed the view that "at the time of the tonsillectomy a blind biopsy should have been done on the nasopharynx," and agreed that "if Dr. Bond did not examine [Ms.] Ivanjack's nasopharynx, that he would have breached the standard of care." He saw "no evidence in the record" that Dr. Bond had examined Ms. Ivanjack's nasopharynx. He stated that Ms. Ivanjack "is cured and

probably will remain so." Moreover, in his view, an earlier diagnosis of the cancer would not have made a difference.

Dr. Glenn Tonnesen, a radiation oncologist, who also conducted a record review on behalf of Dr. Bond, testified that it is "more likely than not that [Ms.] Ivanjack had Stage IV disease in June [or May 1991]" because "[i]n May she had swollen nodes in her neck." He expressed the opinion that the treatment for Ms. Ivanjack would not have been different had she been diagnosed in June, and stated further: "I don't believe that she would have been any more or less likely to be cured in June than she was in September." On cross examination, he stated that it was possible no Stage IV tumor existed in May or June 1991, but that it "probably [was] a Stage III tumor because it was extending." He also acknowledged that there was no "evidence of bone invasion until [the] CAT scan done at the end of August 1991." He considered Ms. Ivanjack to be "cured" "to a high degree of medical certainty."

The jury was given a "jointly proposed" verdict form which was completed as follows: (1) "The medical care rendered by defendant (Dr. Bond) failed to meet the appropriate standard of care"? The jury responded: "Yes"; (2) "[D]o you find that the failure to meet the standard of care was a proximate cause of injuries to Lesley Ann Ivanjack?" The jury responded: "Yes"; (3) "What amount do you award to Lesley Ann Ivanjack?" The jury responded: "$2,206,000.00." Neither Dr. Bond nor Ms. Ivanjack requested special interrogatories relating to causation or damages.

On November 26, 1997, Dr. Bond filed a motion for judgment as a matter of law, or in the alternative, a new trial or remittitur. On December 12, 1997, the trial court apparently heard argument on the motion.[1] The court concluded that the case satisfied "the Impact Rule," and that "there is a

---

**1.** The copy of the transcript of December 12, 1997, which was submitted to us, contains

only the conclusions of the trial judge.

sufficient predicate in proximate causation to sustain the pain and suffering and mental anguish claims." The trial judge added: "I further believe that the verdict was not against the weight of the evidence, but I do believe that this verdict was such as to show that the jury's response was in part motivated by passion. A passion not only for the plaintiff which is understandable, but a passion and bias against the defendant." The trial court determined that "the amount of the verdict was grossly excessive, insupportable on a rational basis and accordingly does shock the conscious of the Court ." Consequently, the trial court denied the motion for judgment as a matter of law and the alternative motion for a new trial "insofar as [it sought] an unconditional new trial," but granted the alternative motion for remittitur, provided Ms. Ivanjack agreed to take a judgment for $1,506,000.00.

## ANALYSIS

■■■ Dr. Bond challenges the decision of the trial court to deny his motion for judgment as a matter of law and his alternative motion for a new trial. "Generally, a motion for judgment after trial and verdict is granted only in 'extreme cases.'" *United Mine Workers of America v. Moore,* 717 A.2d 332, 337 (D.C.1998) (citing *Daka, Inc. v. Breiner,* 711 A.2d 86, 96 (D.C.1998)) (quoting *Oxendine v. Merrell Dow Pharm., Inc.,* 506 A.2d 1100, 1103 (D.C.1986)). "[W]e view the evidence in the light most favorable to the appellee[ ], and '[w]e reverse only if no reasonable juror could have reached the verdict.'" *District of Columbia v. Walker,* 689 A.2d 40, 42 (D.C.1997) (quoting *Kane v. Ryan,* 596 A.2d 562, 564 (D.C.1991) (citations omitted)). We review the trial court's ruling on a motion for a new trial only for abuse of discretion. *Moore, supra,* 717 A.2d at 337 (citing *Gebremdhin v. Avis Rent–A–Car System, Inc.,* 689 A.2d 1202, 1204 (D.C.1997)). "To grant a motion for a new trial, the trial court must find that the verdict is against the weight of the evi-

dence, or that there would be a miscarriage of justice if the verdict is allowed to stand." *Id.*

### The Motion for Judgment As a Matter of Law

In arguing that the trial court erred by denying his motion for judgment as a matter of law, Dr. Bond challenges the sufficiency of the evidence as to causation. He asserts that the jury would have had to speculate as to the causes of Ms. Ivanjack's pain because "[n]o expert (not even Dr. Quick) opined that Ms. Ivanjack, who had a lengthy history of such ills [that is, ear infections with bulging eardrum, fluid in her ears, and hearing loss], would not have suffered from them had she not also had cancer." Moreover, he claims, "there was an insufficient basis to distinguish between what might be a natural consequence of the condition from what may properly be assigned to Dr. Bond"; and "there was no expert testimony to permit the [j]ury to parcel the 'fear' that could be assignable to Dr. Bond's conduct." Nor, Dr. Bond claims, was expert evidence presented as to the cause of Ms. Ivanjack's emotional distress. To support his contentions, he relies primarily on *Baltimore v. B.F. Goodrich Co.,* 545 A.2d 1228 (D.C. 1988), and *Carmichael v. Carmichael,* 597 A.2d 1326 (D.C.1991), neither of which involved a medical malpractice claim for failure to properly diagnose cancer.

Ms. Ivanjack argues that Dr. Bond's failure to request a special verdict form bars him from challenging the sufficiency of the evidence because she presented multiple injury claims to the jury, including pain and emotional distress, and it is impossible to determine on which of her claims the jury based its verdict. She emphasizes the fact that Dr. Bond did not object when the trial judge instructed the jury as to seven different categories of harm for which damages could be awarded, stating that they could "take into consideration any of the following which [they

found] proximately resulted from [Dr. Bond's] negligence":

> [F]irst, the extent and duration of any bodily injuries Ms. Ivanjack sustained as a consequence of the delay in the diagnosis of her cancer.
>
> Two, you may consider the effects of such injuries on the plaintiff's overall physical health and mental well-being.
>
> Three, you may consider any physical pain she has suffered as a consequence of the delay in the diagnosis.
>
> Four, you may consider any fear, anxiety, depression and mental anguish she has suffered as a result of the delay in diagnosing the cancer.
>
> Five, you may consider any fear, anxiety, depression and mental anguish she will probably suffer in the future as a consequence of the delay in diagnosis.
>
> Six, you may consider any inconvenience or discomfort she has already suffered as a consequence of the delay.
>
> Seven, and finally, you may consider any inconvenience or discomfort she will probably suffer in the future as the consequence of the delay in the diagnosis of the cancer.

She argues, in essence, that categories one, two, six and seven did not relate to damages for the emotional distress, and pain and suffering about which Dr. Bond complains. She maintains that she presented expert testimony as to her pain being caused by the cancer through Dr. Quick's testimony, and that Dr. Bond failed to introduce evidence showing that her pain was caused by another source such as hearing loss, or a bulging eardrum. She emphasizes Dr. Quick's testimony as to the lateness of her cancer diagnosis and the heightened chances of recurrence.

■ We turn, first, to Ms. Ivanjack's contention that Dr. Bond is foreclosed from challenging the sufficiency of the evidence because he failed to request a special verdict form. In *Nimetz v. Cappadona*, 596 A.2d 603 (D.C.1991), a medical malpractice case, we concluded that "[the]

defendant-appellant [was] estopped from claiming error as to one of several theories of recovery, absent a request for [a] special verdict, because [the] jury may have found for plaintiff on a theory unaffected by trial court error." *Obelisk Corp. v. Riggs Nat'l Bank of Washington, D.C.*, 668 A.2d 847, 851 (D.C.1995) (summarizing the main conclusion in *Nimetz, supra* ). We specifically held in *Nimetz* "that a defendant who fails to request a special verdict form in a civil case will be barred on appeal from complaining that the jury may have relied on a factual theory unsupported by the evidence when there was sufficient evidence to support another theory properly before the jury." *Nimetz*, 596 A.2d at 608. Initially, we applied the *Nimetz* rule only to cases involving multiple theories of liability. In *Robinson v. Washington Internal Med. Assocs.*, 647 A.2d 1140 (D.C.1994), however, we held

> that a plaintiff who fails to request a special verdict or a general verdict with interrogatories, in a negligence action where the defense both denies negligence (or, relatedly, proximate cause) and asserts an affirmative defense, is estopped from contending on appeal that the jury may have relied on an impermissible affirmative defense theory if the evidence supports an alternative rejection of primary negligence by the jury.

*Id.* at 1145. Thus, we extended the application of the *Nimetz* estoppel principle to cases involving an affirmative defense where there is also a general denial of negligence and proximate cause.

■ In this case, Dr. Bond generally denied negligence, arguing that he did not breach the standard of care owed to Ms. Ivanjack because he performed a nasopharyngeal examination in June and July 1995, and that even if he had breached the standard of care, it was not the proximate cause of her injuries. He raised no affirmative defenses. In that regard the case is unlike *Robinson, supra*. Ms. Ivanjack raises *Nimetz, supra*, apparently in an ef-

fort to extend its reach to any element of the plaintiff's case, including the various components of damages on which a jury is instructed. We have never extended the *Nimetz* principle to different types or sub-species of damages and see no need to do so in this case.[2] We are satisfied that because reasonable jurors could have found liability on the evidence presented, the trial court did not err by denying judgment for Dr. Bond as a matter of law.

The record before us does not support Dr. Bond's argument that the jury was required "to speculate among multiple causes [of Ms. Ivanjack's injuries], unaided by expert testimony." The trial judge's jury instruction on proximate cause, to which Dr. Bond does not object on appeal, stated in part:

> [T]he essence of proximate cause insofar as this case is concerned is whether the injury claimed was in substantial part brought about by negligence, by a violation of the standard of care. In other words, was the violation of the standard of care, if you find that such occurred, was that a substantial factor in bringing about the injury[?] ...
>
> The question more precisely is, whether the claimed delay in diagnosis and treatment, if you find that that was brought about by negligence, whether that delay produced injury. And it would have to be an injury separate and apart from the injury that would happen in the normal course of events with such pathology.

The injuries alleged by Ms. Ivanjack were pain during the delay in diagnosis; and mental anguish and emotional distress based on her fear of recurrence of her cancer.

We review the record before us in the light most favorable to Ms. Ivanjack. In determining whether proximate cause existed in this case, a reasonable juror could have relied on Dr. Quick, one of Ms. Ivanjack's experts, who testified that "the effect of the [eighty-one to eighty-four day] delay [in the diagnosis of her cancer] was that the tumor itself grew and the spread of the tumor occurred." Had the cancer been properly diagnosed in June 1991, he opined, a Stage II tumor mass would have been detected, instead of the Stage IV tumor which was present in September 1991. Even Dr. Bond's expert, Dr. Tonnensen, acknowledged that there was no evidence that the cancer had invaded the bone of Ms. Ivanjack's skull until her August 1997 CAT scan. A reasonable juror also could have given substantial weight to the testimony of Dr. Romanczuk that had Dr. Bond evaluated or examined Ms. Ivanjack's nasopharynx in June 1991, or performed a biopsy on the mass in Ms. Ivanjack's neck, he would have diagnosed the cancer in June 1991. From this testimony, a reasonable jury could infer that Ms. Ivanjack's pain would not have grown worse, and would have subsided earlier had she been properly diagnosed in June 1991. Furthermore, Ms. Ivanjack made a direct association between the delay in diagnosis and her emotional distress, as manifested by her fear of recurring cancer: "Because the cancer was diagnosed later, my perception is that I will have a reoccurrence. And if indeed I do, it's unlikely that I will survive the reoccurrence."

Moreover, the jury heard Dr. May's testimony that, during the period of delay in diagnosis of Ms. Ivanjack's cancer in Summer 1991: "[S]he was in very sad shape. She was exhausted, she was in tremendous pain, she was virtually cringing." In addition, Ms. Ivanjack's testimony described

---

**2.** In *Molovinsky v. Fair Employment Council of Greater Washington, Inc.,* 683 A.2d 142 (D.C.1996) an issue arose as to standing to recover compensatory damages. We said: "Although the record does not reflect the basis for the jury's award of damages to [the appellee], [the appellant's] failure to request a special verdict enables us to affirm the award on the frustration of purpose theory." *Id.* at 147 n. 7. In essence, we applied *Nimetz* in *Molovinsky* because theories as to standing to assert a liability claim were at issue, not because of various theories of damages.

the worsening of her pain between June and September 1991, the spread of the pain from the right ear to the side of her neck and her throat. The pain became so intense that "[t]he whole side of [her] head was like on fire." After her tonsillectomy in July 1991, the pain became worse and she took "handfuls" of Advil. Dr. Quick was asked whether he had an opinion to a reasonable degree of medical certainty that the "spread [of Ms. Ivanjack's cancer] to involve the base of the skull ..., the lymph node, ... and ... the nerves" would result in the patient experiencing pain. He replied "yes," associating Ms. Ivanjack's pain with "the pressure of the tumor against the bone" and further stated that "[t]he pressure of the tumor or the involvement in the [facial] nerve would cause pain, as well as other problems with the nerve function." He rejected the possibility that tonsillitis could have explained her "symptoms and problems." Since there was substantial evidence of Ms. Ivanjack's physical pain during the period of delay in her diagnosis, a reasonable juror could rely solely on her testimony concerning her fear of recurring cancer. *See District of Columbia v. McNeill*, 613 A.2d 940, 944 (D.C.1992). Thus, viewing the evidence in the light most favorable to Ms. Ivanjack, reasonable jurors "could reach a verdict in [her] favor...." *Finkelstein v. District of Columbia*, 593 A.2d 591, 594 (D.C.1991) (quoting *Oxendine v. Merrell Dow Pharm, Inc.*, 506 A.2d at 1103.)

In contrast to the evidence presented by Ms. Ivanjack as to causation of her pain and emotional distress, Dr. Bond failed to present credible evidence at trial to support his contention on appeal that there were multiple causes of Ms. Ivanjack's pain, including ear infections with bulging eardrum, fluid in her ears, and hearing loss. His reliance on *Baltimore, supra,* and *Carmichael, supra,* is misplaced. The evidence introduced at trial in *Baltimore* showed that the plaintiff, whose jury award was reversed by the trial court as a matter of law, had "many preexisting injuries," including a lumbar disc problem, advanced degenerative osteo-arthritis, hypertension, hardening of the arteries, progressive vascular disease and "an array of personality disorders and difficulties...." *Id.* at 1230. Unlike the medical expert in *Carmichael, supra,* Ms. Ivanjack's expert did present testimony that demonstrated "a causal relationship between [the malpractice] and [her] injury." *Id.* at 1329. Not only did Dr. Quick testify as to the causal relationship between Ms. Ivanjack's pain and her cancer, but also the effect of the delay in diagnosis of the tumor's growth from Stage II to Stage IV. From Dr. Quick's testimony a reasonable juror could infer at least that Ms. Ivanjack had eighty-one to eighty-four more days of pain due to the delay in her diagnosis and the growth and invasion of her tumor into the base of her skull.

Ms. Ivanjack's case has features similar to that of *Boryla v. Pash,* 960 P.2d 123 (Colo.1998), but there is nothing in that case which indicates that the plaintiff in *Boryla* experienced the intense pain about which Ms. Ivanjack complained during the delay in her cancer diagnosis. Ms. Boryla detected a lump in one of her breasts in February 1990. Her family physician referred her to another doctor who performed a biopsy in late February 1990. He did not request a mammogram. The results of the biopsy were negative. Ms. Boryla continued to feel the lump and returned in April 1990 to the doctor to whom she had been referred. He did a needle aspiration of the lump but did not draw blood. Nor did he schedule a mammogram until late May 1990. The mammogram revealed a potentially malignant area and a biopsy confirmed invasive cancer. Ms. Boryla sued the doctor to whom she had been referred, "alleg[ing] that the ninety-two day delay in diagnosing her condition resulted in an increased number of cancer cells in her body and caused the tumor to grow in size." *Id.* at 125.

Ms. Boryla sought damages for, *inter alia,* pain and emotional distress, including

"fear of an increased risk of recurrence of cancer." *Id.* In reinstating a judgment based on a jury verdict in Ms. Boryla's favor after that judgment had been reversed by the Colorado Court of Appeals, the Colorado Supreme Court concluded in part:

> At the outset, we note that Boryla did not request damages for the increased possibility that she might suffer a recurrence of cancer in her complaint. Instead, she sought damages for "emotional distress, including *fear of* an increased risk of recurrence of cancer." (Emphasis supplied). . . .
>
> Boryla presented evidence that the delay in diagnosis led to the following physical effects: (1) an increase in the size of the tumor and the number of cancer cells in her body; (2) the possible metasis of existing cancer cells . . . .
>
> [B]y presenting evidence that her condition physically worsened as a result of the delayed diagnosis, Boryla established an attendant physical injury which permitted the jury to consider damages for the emotional distress stemming from her fear of an increased risk of cancer recurrence . . . .
>
> That emotional distress would be a consequence of defendant's alleged negligence need not be supported by expert testimony, such being a matter fully within the personal knowledge or experience of the jury.

*Id.* at 127 (quoting *MacMahon v. Nelson,* 39 Colo.App. 355, 568 P.2d 90, 91 (1977) (other citations omitted)). Ms. Ivanjack's case differs from those in which cancer has not been diagnosed but, because of exposure to toxic substances, there is a fear of cancer. As the court said in *Boryla:*

> Contrary to toxic exposure cases, where the plaintiff has yet to experience the onset of cancer, fear of cancer cases in the medical setting usually involve a negligent misdiagnosis of a patient's existing cancer. In cases where the plaintiff demonstrates that her cancerous condition physically worsened as a result

of the delayed diagnosis, the plaintiff has demonstrated a sufficient physical injury to permit the recovery of emotional distress damages. [Citations omitted.] Thus, the usual reservations courts have concerning jury speculation and conjecture in cases involving plaintiffs seeking purely emotional damages are inapplicable in a case such as Boryla's.

*Id.* at 128–29 (citing *Towns v. Anderson,* 195 Colo. 517, 579 P.2d 1163, 1164 (1978)).

Based on the foregoing analysis, the trial court did not err by denying judgment for Dr. Bond as a matter of law.

*The New Trial Motion*

We turn now to Dr. Bond's contention that the trial court abused its discretion by denying his motion for a new trial based on his argument that the jury verdict was excessive and the trial court's finding that the verdict was motivated by the jurors' passion and bias. In *Finkelstein, supra,* we reiterated that we " 'must accord great deference to the trial court's decision to grant or deny a motion for new trial based on excessiveness of the verdict and may reverse that decision only for abuse of discretion." ' 593 A.2d at 596 (quoting *Louison v. Crockett,* 546 A.2d 400, 403 (D.C.1988) (quoting *International Sec. Corp. of Va. v. McQueen,* 497 A.2d 1076, 1081 (D.C.1985) (footnote omitted))).

■ Dr. Bond argues that the $2.2 million verdict was excessive compared with a chart of "plaintiff verdicts in cases involving claims for emotional distress resulting from fear of cancer." We have stated previously, however,

> that excessive verdicts should not be measured strictly on a comparative basis. Instead, "[e]ach case in this area necessarily rises or falls on its own facts and the trial court in ruling on the question of whether or not a jury verdict is excessive must determine on the totality of facts before it whether it was the result of passion, prejudice or mistake."

*Daka v. Breiner,* 711 A.2d 86, 100 (quoting *May Dept. Stores v. Devercelli,* 314 A.2d

767, 775 (D.C.1973) (other citation omitted)). Moreover, the chart on which Dr. Bond relies is replete with fear of cancer cases due to exposure to asbestos where the current malady is asbestosis, pleural plaques or pleural thickening rather than cancer. In addition, the chart provides no underlying factual context for the listed cases.

■ In the case before us, the trial court meticulously instructed the jury as to seven injuries that could serve as the basis for damages. See *Factual Summary, supra.* Dr. Bond did not object to this instruction. Furthermore, although the trial court determined that the jury verdict was "in part motivated by passion" and "bias against the defendant," it stated that "the verdict was not against the weight of the evidence." The trial judge undoubtedly reduced the jury's verdict by approximately three quarters of a million dollars to account for that part of the verdict which he perceived to be based on passion and bias. In sum, on the record before us, we cannot say that the trial court abused its discretion by denying Dr. Bond's motion for a new trial, provided Ms. Ivanjack accepted the reduction in the jury award, which she did.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.