Surjit **SINGH**, M.D., Appellant–
Defendant,

v.

Diane **LYDAY**, Betsy Calderhead,
and Cara Nichols, Appellees–
Plaintiffs.

No. 84A05–0709–CV–538.

Court of Appeals of Indiana.

June 27, 2008.

Rehearing Denied Aug. 28, 2008.

David C. Jensen, Alyssa Stamatakos, Eichhorn & Eichhorn, LLP, Hammond, IN, Attorneys for Appellant.

Eric A. Frey, Frey Law Firm, John P. Nichols, Anderson & Nichols, Terre Haute, IN, Attorneys for Appellees.

## OPINION

ROBB, Judge.

### Case Summary and Issues

Surjit Singh, M.D., appeals from the trial court's grant of a Motion to Correct Error filed by the plaintiffs below, Diane Lyday, Betsy Calderhead, and Cara Nichols (referred to collectively as the "Patients"). In granting this motion, the trial court vacated the jury's verdict in favor of Singh on the Patients' claims of malpractice, gross negligence, and battery, and ordered a new trial. On appeal, Singh argues that the trial court improperly granted this motion and improperly denied his motion for a judgment on the evidence. Concluding the trial court abused its discretion in ordering a new trial and that the trial court improperly denied Singh's motion for judgment on the evidence on the Patients' claims of malpractice and gross negligence, we reverse and remand with instructions that the trial court enter judgment on the evidence in favor of Singh on the malpractice and gross negligence claims and reinstate the jury's verdict on the battery charge.

### Facts and Procedural History

Singh is a psychiatrist with offices in Terre Haute, Indiana. Lyday saw Singh from February 2000 to March 2001 for

issues including flashbacks to traumatic childhood experiences and panic attacks triggered upon leaving her home. According to Lyday, after seeing Singh for several months, Singh touched her inappropriately during an office visit. Specifically, Lyday claims that Singh instructed her to lift up her shirt so that he could listen to her heart, rubbed her sides, touched her breasts, and had Lyday straddle his leg. After this alleged event, Lyday saw Singh up to fifteen more times. Singh ended his professional relationship with Lyday in March 2001. Singh stated that he had been reducing the amount of drugs he was prescribing for Lyday and that she was not happy with this situation. Singh learned that she had been seeking prescriptions from other doctors, and indicated that Lyday was using abusive language towards his staff, and demanding to be seen and to receive prescriptions for larger doses of medication. Eventually, it got to the point that his staff "[could not] handle her anymore," and he told her that she "need[ed] to seek help somewhere else." Transcript at 563.

Nichols was a patient of Singh's from September 1998 to April 2000. Nichols saw Singh for treatment for anxiety, depression, and panic attacks. During her treatment, Singh prescribed a variety of medications, but none seemed to result in significant improvement. Nichols testified that at some point after August 1999, Singh touched her inappropriately. Specifically, she claimed that Singh frequently asked her to remove her shirt, bra, and pants in order to listen to her heart and check for swelling in her legs. Nichols's last meeting with Singh occurred on April 12, 2000, after which Nichols told Singh that she could no longer afford his services, and would be seeking less expensive care.

Calderhead saw Singh in 1995 or 1996 to seek treatment for anxiety and depression stemming from the death of her child. Calderhead returned to Singh in April 1999 with more substantial symptoms of anxiety and depression. Singh diagnosed her with depression and prescribed antidepressants. According to Calderhead, Singh first engaged in inappropriate conduct on January 6, 2000, when he asked her to remove her shirt and pants, rubbed his hands along her legs and underneath her bra and underpants, and also rubbed his erect penis against her. She claims that two of her sons, one who was seven or eight years old, and another who was eighteen months old, were in the room during this conduct. She claims that Singh engaged in similar conduct during subsequent visits. At some point, Singh received an anonymous call indicating that Calderhead had been selling drugs and taking money from mentally retarded patients. Singh called a local pharmacy and learned that Calderhead was receiving prescriptions for pain medication and antidepressants from both him and her family physician. Singh called Calderhead to confront her with this allegation, and Calderhead became angry and hung up on him. Singh did not see Calderhead following this conversation.

On November 2, 2001, the Patients filed a proposed complaint with the Indiana Department of Insurance. The Department's Medical Review Panel (the "Review Panel") issued an opinion on April 19, 2004, indicating that there was "a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury." Plaintiff's Ex. 1. On June 29, 2004, the Patients filed a complaint, "individually and on behalf of all persons who are similarly situated," in the trial court alleging that Singh failed to meet the applicable standard of care, "in that [he] engaged in transference activity or phe-

nomenon by using his position as a therapist to have the plaintiffs disrobe, and engage in sexual activity by allowing him to touch their breasts and other parts of their anatomy." Appellant's Appendix at 19. The Patients sought damages for "emotional distress, mental stress, emotional trauma, and inability to live a normal life." *Id.* at 21.

On January 13, 2005, Tamara Betz filed with the Review Panel a "Proposed Complaint," containing an allegation identical to that contained in the Patients' complaint.[1] On March 3, 2006, the trial court issued an order granting Singh's motion for summary judgment in regard to Betz, finding that her complaint was barred by the statute of limitations.

On June 4, 2007, Singh filed a motion in limine, seeking an instruction prohibiting various testimony, including hearsay testimony indicating that any other patient of Singh had reported that he had engaged in sexual conduct with a patient and prohibiting testimony from Betz. On June 7, 2007, the trial court granted this motion, except that it took under advisement the prohibition on testimony by Betz.

On June 11, 2007, the jury trial began. The Patients called Singh and the following exchange took place:

Q: Now had there been other patients of yours besides the three plaintiffs who made similar allegations during the approximately same period of time?

A: No.

[Singh's Counsel]: I'm going to object to that, Your Honor, as being irrelevant and outside the scope of the motion in limine, that's something that has already been covered.

Court: Sustained, although he already answered it.

Tr. at 264. Singh also testified during his presentation of evidence. During cross-examination, the following exchange occurred:

Q: Now has [sic] any other patients besides these three plaintiffs contended or claimed that you performed an inappropriate examination or touched them in an inappropriate way.

[Singh's counsel]: Your Honor, I'm going to object to that. It's irrelevant to the issues here that has [sic] been covered.

Court: It has been asked and answered.

Q: Doctor Singh, let me hand you a proposed complaint filed by Tamara Betz against you.

[Singh's counsel]: I'm going to object to that evidentiary harpoon, this has already been asked and answered, it's already been covered and I make the same objection I just made.

Court: Sustained!

*Id.* at 588.

Singh also called Lyday's niece, Holly Lyday, who had seen Singh on Lyday's suggestion. This suggestion came after Lyday had filed her complaint with the Review Panel. Holly testified that she had talked with Lyday about the allegations, and that Lyday "just laughed about it and said that her and some other girls were going to sue Doctor Singh, and that he had had her lift her shirt up and fondled them and all of this and that, but that she was lying about it." *Id.* at 332. Holly also testified that Lyday had asked her to testify that Singh had touched her inappropriately, and that after Holly refused, Lyday "got mad at me because I kept going to see him." *Id.* at 333. Holly also testified that Singh had never acted inappropriately toward her.

---

**1.** The same counsel representing the Patients represented Betz.

Sigh also introduced the video-taped deposition of Ruth Casteel. Casteel testified that she met Nichols while they were both in the psychiatric unit in Terre Haute Regional Hospital, and that on several occasions Nichols had offered her money to say that Singh had touched Casteel inappropriately.

After Singh rested, he moved, pursuant to Indiana Trial Rule 50(A)(2), for judgment on the evidence, arguing that the Patients could not succeed as they had presented no expert testimony establishing that Singh's alleged misconduct had caused the Patients' alleged injuries or damages. The trial court denied Singh's motion.

On rebuttal, the Patients attempted to introduce Betz's Proposed Complaint for purposes of impeachment. Singh objected, and the trial court sustained the objection, stating:

> It is my opinion that without the live witness here, who was not allowed to testify because she was not added to the witness list that there is not a sufficient foundation to show that this particular claimant had such a similar type of experience that she would be allowed to testify under 404(B) and therefore, merely bringing in the complaint in answer to his question that there was no other implies that there is such a type of signature and I think that the prejudicial nature of that outweighs the benefit of allowing it in just for the purpose of impeaching him on the answer "no" that's the basis of my ruling.

*Id.* at 612. The Patients also attempted to introduce the testimony of Tammie Young,

who had been a patient of Singh's between 1998 and 1999. Patients' counsel claimed Young had contacted him the morning of the last day of trial. Singh objected to the admission of this testimony,[2] and the trial court sustained the objection.

On June 15, 2007, the jury returned a verdict in favor of Singh and the trial court entered judgment accordingly. On July 16, 2007, the Patients filed a Motion to Correct Error, arguing, among other things, that the trial court had improperly sustained Singh's objection to the admission of Betz's Proposed Complaint and refused to allow Young's testimony.[3] On August 1, 2007, the trial court issued an order granting the Patients' motion. The trial court's order indicates that Singh had responded negatively to the question, "Now had there been other patients of yours besides the three plaintiffs who made similar allegations during approximately the same period of time?" and goes on to state:

> The credibility of the various parties and witnesses was the sole issue presented in this trial. Upon reflection, the Court has concluded that to not allow the Plaintiffs to impeach the Defendant's incorrect response as rebuttal was an erroneous decision which was prejudicial and harmful to the Plaintiffs' case.

> The Plaintiffs also attempted to offer a rebuttal witness, Tammie Young, who came forward during the trial after seeing media coverage of the trial to testify that the Defendant had fondled her inappropriately in a similar manner while she was his patient. The court, over objection, would not allow her testimony.

2. The substance of Young's testimony is discussed in detail below.

3. The Patients also alleged that during or after the trial, five other witnesses had contacted Patients' counsel regarding similar acts

committed by Singh. The trial court's ruling on the Patients' motion to correct error does not mention these new witnesses, and neither party has addressed these new witnesses in its brief.

Again upon reflection, the Court concludes that the proper course would have been to continue the trial for a short period to allow the attorneys for both sides to determine what her testimony would be and whether it was admissible. To not allow that opportunity was an erroneous decision which was prejudicial and harmful to the Plaintiffs' case.

Appellant's App. at 11. The trial court then vacated the jury verdict and ordered a new trial. Singh now appeals.

### Discussion and Decision

### I. Motion to Correct Error

#### A. Standard of Review

Under Indiana Trial Rule 59(J), if a trial court, "determines that prejudicial or harmful error has been committed, [it] shall take such action as will cure the error, including ... [g]rant a new trial."

We generally review a trial court's decision to grant a motion to correct errors and order a new trial for an abuse of discretion. *Centennial Mortg., Inc. v. Blumenfeld,* 745 N.E.2d 268, 273 (Ind.Ct.App.2001). We will reverse a trial court's decision to grant a motion to correct error only when "the trial court's decision was against the logic and effect of the facts and circumstances before it, together with the inferences that can be drawn therefrom." *Childress v. Buckler,* 779 N.E.2d 546, 550 (Ind.Ct.App.2002). However, the situation here is not typical, in that the trial court granted a new trial based on its decision to exclude evidence— a decision itself within the trial court's discretion. Research has disclosed a single Indiana case in which an appellate court reviewed a trial court's grant of a new trial based on its decision that it had abused its discretion regarding the admission of evidence. In *State v. Valley Dev.*

*Co.,* 256 Ind. 278, 268 N.E.2d 73 (1971), the trial court granted the appellee's motion for a new trial based on the admission of testimony and the issuance of a jury instruction. Our supreme court reversed the trial court's grant of a new trial. Justice Prentice dissented, stating

I believe that we all will agree that the trial court might have denied admission of the evidence complained of, or, having admitted it, it might have denied the instruction, and neither would have been reversible error. Admitting that the admissibility of the evidence was discretionary and assuming arguendo that the giving of the instruction was not reversible error but was also discretionary with the court, then the holding of the majority is that a trial court may not, on motion for new trial or to correct errors, reverse its position taken upon an earlier issue where the ruling lay within the discretion of the court.

256 Ind. at 285–86, 268 N.E.2d at 78. If we accept Justice Prentice's characterization of the majority's opinion, then in this case, we would review whether the trial court's initial exclusion of the evidence was within the trial court's discretion. A conclusion that the initial exclusion was not an abuse of discretion would then render the grant of a new trial improper. However, we do not conclude that Justice Prentice's dissenting opinion sets forth the applicable standard of review for a trial court's grant of a new trial based on a discretionary decision made at trial.

First, the majority opinion in *Valley Development* does not explicitly identify the employed standard of review. At trial, the appellee objected to the admission of evidence on the ground of remoteness and to the jury instruction on the ground that it put too much emphasis on this evidence. Our supreme court phrased the issue as whether the evidence was in

fact inadmissible on the ground of remoteness. *Id.* at 280, 268 N.E.2d at 75. The court then found that this evidence "was not rendered inadmissible solely upon the grounds of [remoteness,]" and that therefore, "[t]he ruling of the trial court at the trial, overruling appellee's objection on the sole ground of remoteness, could not have been error warranting the granting of a new trial." *Id.* at 281, 268 N.E.2d at 76. The court then stated, without further discussion, that it did not "find merit in appellee's objections to the trial court's giving of [the jury instruction.]" *Id.* Therefore, we interpret the majority opinion to hold that a trial court erroneously grants a new trial based on decisions involving discretionary matters when the trial court would have abused its discretion had it ruled differently at trial. When a trial court is faced with a discretionary decision, and later decides to grant a new trial because it then feels it made an improper decision, we hold that the proper standard of review regarding the grant of a new trial is an abuse of discretion.[4] This holding puts Indiana in accord with other jurisdictions that have specifically addressed this issue. *See Burnett v. Fowler,* 315 Ark. 646, 869 S.W.2d 694, 697 (1994) (applying abuse of discretion standard to trial court's grant of a new trial based on its decision after trial that evidence it admitted should have been excluded based on unfair prejudice); *Melo v. Spencer,* 62 Conn.App. 727, 774 A.2d 217, 218 (2001) (explaining that a trial court may issue a new trial if it feels it made an error in jury instructions or evidentiary rulings); *Anderson v. Kohler Co.,* 170 S.W.3d 19, 23 (Mo.Ct.App.2005) ("On a motion for new trial, the trial court may reconsider its rulings on discretionary matters, such as the admissibility of evidence, and may order a new trial if it

believes that its discretion was not wisely exercised and that the losing party was thereby prejudiced."), *trans. denied; Coffey v. Mann,* 7 Neb.App. 805, 585 N.W.2d 518, 525 (1998) (reviewing the trial court's grant of a motion for a new trial based on an erroneous decision regarding the admission of evidence for an abuse of discretion), *rev. overruled; cf. State, Dep't of Health & Rehabilitative Servs. v. Arnold,* 670 So.2d 96, 98 (Fla.Ct.App.1996) ("The standard of review however is not whether evidentiary rulings, subject to the judge's discretion, are proper, but rather whether reasonable persons could differ as to the granting of the new trial."); *Hughes v. State, Idaho Dep't of Law Enforcement,* 129 Idaho 558, 929 P.2d 120, 124 (1996) (affirming trial court's grant of a new trial based on the erroneous admission of evidence even though the appellate court would not have found prejudice based on the evidence's admission).

In determining whether the trial court abused its discretion in granting a new trial based on the exclusion of evidence, we are mindful that "[n]o error in the ... exclusion of evidence ... is ground for granting relief under a motion to correct errors ... unless refusal to take such action appears to the court inconsistent with substantial justice." Ind. Trial Rule 61; *see also* Ind. Evid. Rule 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."); *cf. Finucane v. Union Planters Bank, N.A.,* 732 N.E.2d 175, 178 (Ind.Ct.App.2000) (indicating that reversal is not warranted based on exclusion of evidence unless a party's substantial rights were affected). "The court at every stage of the proceed-

---

4. Under *Valley Development,* a trial court will always abuse its discretion when the initial

decision was the only permissible decision.

ing must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Ind. Trial Rule 61.

### B. Exclusion of Evidence

The trial court found that the Patients had been denied a fair trial because of the erroneous exclusion of evidence, namely the Proposed Complaint and Young's testimony (referred to collectively as the "Excluded Evidence"). Singh argues that the Excluded Evidence was inadmissible, and that therefore, the Patients were not deprived of a fair trial.

#### 1. Rule 404(b)

Singh argues that the Excluded Evidence was inadmissible under Indiana Rule of Evidence 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

The purpose of this rule is to prevent the jury from considering a defendant's past propensities in determining liability for the conduct alleged in the lawsuit. *See Greenboam v. State*, 766 N.E.2d 1247, 1252 (Ind.Ct.App.2002), *trans. denied*. However, as the Patients point out, they did not attempt to admit the Excluded Evidence at trial as substantive evidence,

but instead attempted to introduce it to impeach Singh. In its order granting a new trial, the trial court made no statement regarding the Excluded Evidence's admissibility under Rule 404(b),[5] but found that the Proposed Complaint should have been introduced as impeachment, and that a continuance should have been granted to determine the admissibility of Young's testimony. There is a significant difference between allowing the Patients to have introduced the Excluded Evidence as substantive evidence and allowing them to introduce it as impeachment evidence. *Cf. Martin v. State*, 779 N.E.2d 1235, 1245 (Ind.Ct.App.2002) (recognizing the difference between using a witness's prior statement as substantive evidence and using it for impeachment purposes), *trans. denied*. We decline to speculate as to whether the trial court would have admitted the evidence under Rule 404(b) as substantive evidence.

#### 2. The Proposed Complaint

■ The Patients also argue that Singh "opened the door" to the admission of the Proposed Complaint based on his response in the negative to the Patients' question of "[H]ad there been other patients of yours besides the three plaintiffs who made similar allegations during the approximately same period of time?". Tr. at 264. "A party may 'open the door' to otherwise inadmissible evidence by presenting similar evidence that leaves the trier of fact with a false or misleading impression of the facts related." *Schmidt v. State*, 816 N.E.2d 925, 946 (Ind.Ct.App.2004), *trans. denied*.

Initially, Singh argues that because he objected to the question, and the trial court sustained the objection, Singh's re-

---

5. We note that at trial, the trial court discussed Rule 404(b) and stated that the Proposed Complaint's "prejudicial nature ... outweighs the benefit." Tr. at 612. The trial court did not revisit this analysis in its order on the Patients' motion to correct error.

sponse was not part of the record. However, Singh did not move to strike his response from the record, and it therefore remained in evidence. *Cf. Mason v. State*, 511 N.E.2d 487, 490 (Ind.Ct.App. 1987) (holding trial court did not commit reversible error in sustaining an objection to leading questions where the witness answered the question to which the objection was made), *trans. denied; Hoehn v. State*, 472 N.E.2d 926, 930 (Ind.Ct.App.1984) (holding that the defendant was not prejudiced by the trial court's error in sustaining the State's objection where the witness answered the question prior to the objection and the State did not move to strike the answer and the trial court did not admonish the jury to disregard the answer); *Plan–Tec, Inc. v. Wiggins*, 443 N.E.2d 1212, 1230 (Ind.Ct.App.1983) (holding that a party could not complain that testimony violated a motion in limine where the party did not object before the answer was given and failed to move to strike the prohibited response).

However, we conclude that Singh's response to the question did not open the door to impeachment by the Proposed Complaint for the simple reason that nothing in the Proposed Complaint impeaches Singh's response. Singh was asked whether any other patient had filed a complaint against him "during the approximately same period of time." Tr. at 264. The Patients filed their complaint with the Review Panel on November 2, 2001. The Proposed Complaint indicates that it was filed on January 13, 2005, and contains no indication that Betz had filed a complaint at an earlier date. As the Proposed Complaint was filed more than three years after that filed by the Patients, the Proposed Complaint does not impeach Singh's response that no other patient filed a complaint at the same time as the Patients.

■■■ The Patients also argue that Singh opened the door through his counsel's opening argument. Singh counters that he could not have opened the door through his counsel's opening statement, as such statements are not considered evidence. We agree that opening statements are not substantive evidence. *See Fitz v. Rust–Oleum Corp.*, 883 N.E.2d 1177, 1182 (Ind.Ct.App.2008). However, counsel may open the door to permit the admission of otherwise inadmissible evidence through an opening statement. *See United States v. Kerr*, 981 F.2d 1050, 1052 (9th Cir.1992); *cf. Werne v. State*, 750 N.E.2d 420, 423 (Ind.Ct.App.2001) (analyzing counsel's opening statement in determining whether the defendant had opened the door to the admission of otherwise inadmissible evidence), *trans. denied; id.* at 435 (Bailey, J., dissenting) (concluding that the defendant opened the door during his counsel's opening statement).

However, having reviewed Singh's counsel's opening statement,[6] we find nothing

---

**6.** In their brief, the Patients claim that Singh's counsel asserted "in opening statement that Singh had been found to never have inappropriately touched any patient." Appellee's Br. at 21. The Patients fail to support this statement with a citation to the record. Upon reviewing the record, we fail to find any such statement made by Singh's counsel in opening. Singh's counsel stated that testing revealed "no indication that he had been involved in any kind of willful sexual improprieties with his patients." Tr. at 40. Saying that testing failed to reveal one thing is inherently different from saying that testing affirmatively found another thing. We admonish Patients' counsel to support their factual statements with citation to the record. *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 n. 5 (7th Cir.2008) (recognizing that a party's failure to adequately cite to the record renders a court's task "unnecessarily burdensome"); *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 664 n. 2 (7th Cir.2005) ("It is the parties' duty to package, present, and support their arguments, and we

in it that opened the door to impeachment by the Proposed Complaint. In his opening argument, Singh's counsel stated that Singh "first learned of these allegations in April of 2000 right after Betsy Calderhead and Cara Nichols had stopped being his patients," tr. at 39, and indicated that Singh had then gone to a facility where he underwent testing that revealed no indication that Singh had engaged in improper conduct with patients. Betz's complaint is merely that, a complaint. It does not contradict the statement regarding the testing. As stated above, it wasn't filed until well after April of 2000, and therefore does not contradict counsel's representation that Singh learned of the allegations in April 2000. The Proposed Complaint did not impeach Singh's response or contradict his counsel's opening statement. The trial court's decision to grant a new trial based on this reasoning is therefore clearly against the logic and effect of the circumstances.

### 3. Young's Testimony

■ Initially, we note a fundamental problem with the trial court's grant of a new trial based on its exclusion of Young's testimony. In its order, the trial court states that the "proper course would have been to continue the trial for a short period to allow the attorneys for both sides to determine what her testimony would be and whether it was admissible." Appellant's App. at 11. However, neither party requested a continuance. We fail to see how the Patients could have been prejudiced by the trial court's failure to grant a continuance when none was requested. Moreover, as the Patients made an offer to prove Young's testimony, no continuance was necessary to determine what her testi-

mony would be. *See Arhelger v. State,* 714 N.E.2d 659, 664 (Ind.Ct.App.1999) ("An offer to prove is the method by which counsel places before the trial court (and ultimately the reviewing court) the evidence he or she wishes to present, to allow the court to determine the relevancy and admissibility of the proposed testimony." (quoting Robert Lowell Miller, Indiana Evidence § 103, 110 at 27–28 (1984))). Again, we fail to see how reversible error can be premised on the trial court's failure to allow the attorneys time to discern the substance of Young's testimony when all parties, the trial court included, were aware of its substance after the offer to prove. Both parties seem to recognize that the substance of Young's testimony is known, as they both discuss its content in their appellate briefs. Although the trial court's order does not indicate that any part of Young's testimony is indeed admissible, or that the failure to admit any of the testimony prejudiced the Patients' substantial rights, we will analyze these two issues to determine whether the trial court's order can be affirmed on the grounds that Young's testimony was admissible and that its exclusion prejudiced the Patients' substantial rights.

The following testimony comes from the Patients' offer to prove:

Q: [W]hile you were there as a patient of Doctor Singh's and had been a patient for a while, did he have a situation where he had you undress and did a physical exam on you?

A: Yes.

Q: And in that, did he start touching and rubbing your legs and your breasts?

---

shall not waste our time searching in vain for a dispute of material fact if we come across a factual contention of denial not adequately supported in the record by citation to admissible evidence."). More importantly, we ad-

monish Patients' counsel to accurately reflect the record and to not give this court a false impression as to the facts of the case. *See Varner v. State,* 847 N.E.2d 1039, 1042 n. 2 (Ind.Ct.App.2006), *trans. denied.*

A: Well he like listened to my heart beat, like in my abdomen area, my chest area, and my back.

Q: Was this with or without clothes on?

A: Without clothes on.

Q: Was anybody in the room, a nurse or other health professionals?

A: No.

Q: Did he ask you a lot of questions about sexual activity?

A: He asked me was I sexually active.

Q: But you did feel uncomfortable with the touching and physical exam that he did?

A: Sometimes.

* * *

Court: Now you say that he took your heartbeat with a stethoscope?

Witness: Uh huh, yes.

Court: And on your back?

Witness: Like in my back and my chest.

Court: And your abdomen.

Witness: Uh huh.

Court: Not—did he touch you?

Witness: I mean during the physical.

Court: I mean did he touch your breasts or any of your sexual parts?

Witness: No, not that I can remember like that.

Court: What did you have on?

Witness: A hospital gown.

* * *

Q: Did he actually have you completely disrobe at times?

A: Uh huh, well I left my underwear on.

* * *

Q: Did he actually at times rub your thighs?

A: Not during the physicals, but as like we were talking in a conversation in his office, he might rub or rub my arms.

* * *

Q: When he did the stethoscope of your chest, was it actually on your breasts?

A: At the top and underneath.

Q: Was his hand on the stethoscope at that time?

A: Uh huh.

Q: And it was underneath your gown or on top of your gown?

A: Under my gown.

Q: Was anybody in the room with you?

A: No.

Q: Just him.

A: Just him.

Tr. at 599–604.

The Patients argue that Young's testimony was admissible as impeachment regarding Singh's statements that no other patient had filed a complaint against him at approximately the same time as the Patients, that he had not previously been found to have inappropriately touched other patients, and that "he never examined patients, never had them disrobe or touch them inappropriately and when he touched them he always had a nurse present," appellee's br. at 20.[7]

First, Young testified that she had never complained regarding Singh's conduct, and there clearly has been no finding that Singh touched her inappropriately. Thus, Young's testimony did not impeach or contradict Singh's response to the Patients'

---

**7.** In making this argument, Patients have not cited to the portions of the transcript containing Singh's testimony that Young's testimony purportedly impeaches. This failure has substantially hindered this court's review of the issue, and we again admonish the Patients regarding their failure to support their factual allegations with citations to the record. *See, supra,* note 6.

question regarding complaints by other patients or his counsel's statement regarding the testing Singh underwent.

However, Young's testimony does, to some extent, contradict some responses given by Singh to questions posed to him on cross-examination.

Q: If blood pressures and pulses are written down, they're written down by the nurse and not by you going under their shirt to take them, is that what you're telling the jury, or by your staff?

A: My staff, they do the vital signs.

Q: You don't do that, do you?

A: Mostly they do because we've trained them and they do vital signs before the patient comes to my office.

Q: What about these three plaintiffs, do you ever have a memory at all of having them disrobe and examining them or putting the stethoscope or some instrument underneath their clothing.

A: That is totally preposterous! That's absolutely untrue!

Q: Have you ever done that with any patients?

A: I have done physical examinations, professional physical examinations but not the ones you are alleging.

Q: What I'm alleging is that you touched either their breasts or their legs in an inappropriate manner, not a[n] examination manner, uh, as they have described here in court.

A: I never did that.

Q: With any patient, is that what you are telling me?

A: None of these patients.

Q: What about any other patients?

A: None of the other patients. I have done physical examination, they were physical examinations for the medical illness and for medical reasons, profes-

sional, but never this kind of physical examination.

Q: Describe for the jury what kind of actual physical examination you've done on any kind of patient?

A: It's quite extensive in the record, I used to do in the Regional Stress Unit with a nurse all the time, that's a standard practice and nurse, she will disrobe the patient and she will take to the physical examination room. Some patients, they are in a gown and other patients they are in their own clothes, and when the patient is ready she will call me and I will go and examine the patient and do the physical examination, it's standard practice of cardiovascular, abdominal, neurological examination and listening to the chest.

Q: Now those examinations you did with a nurse present.

A: Absolutely, yes.

Q: And that's appropriate medical practice, isn't it?

A: That's true.

Q: It would be inappropriate medical practice or malpractice as you've testified to here, for you to touch a female patient in any part of her anatomy, such as her breasts or her groin area without a witness there and not doing a normal examination.

A: Yeah, if it's done, it's inappropriate.

Tr. at 585–88.

In her testimony, Young specifically denied that Singh had touched her "breasts or any other of [her] sexual parts." Tr. at 586. Indeed, it is not even clear from her testimony that Singh touched her in any inappropriate manner during the physical examinations. However, she claimed that Singh performed physical examinations without a nurse in the room, contradicting Singh's statement that he conducts physicals with nurses

present. Assuming this testimony would have been admissible on rebuttal,[8] we are left with the question of whether the exclusion of this testimony could have adversely affected the Patients' substantial rights. We conclude that it could not.

The issue of whether Singh conducted physical examinations of Young (or any other patient) with or without a nurse in the room may be relevant. However, it is not an issue determinative of Singh's liability. In a wide variety of contexts, Indiana courts have held that improper rulings regarding the admission of evidence going to matters that are not central to the determination of guilt or liability are not the basis for relief. *See Richter v. State*, 598 N.E.2d 1060, 1064 (Ind.1992) (holding erroneous admission of testimony was not reversible error where the testimony went to an issue "collateral to the issues concerning appellant's guilt or innocence in this case"); *Green v. State*, 542 N.E.2d 977, 980 (Ind.1989) (concluding that defendant failed to establish prejudice stemming from trial court's limitation of his cross-examination of victim's husband regarding victim's intoxication and reasons for the husband and victim breaking up where defendant failed to identify how this evidence would have established a possible motive for husband to have committed the crime); *Wissman v. State*, 540 N.E.2d 1209, 1211 (Ind.1989) (holding exclusion of evidence of victim's blood alcohol content, which defendant argued could have supported finding that victim was lying down when shot, was at most harmless as fact that victim could have been lying down was not determinative of whether victim was shot in the manner claimed by defen-

dant); *Rodgers v. State*, 422 N.E.2d 1211, 1214 (Ind.1981) (holding that erroneous exclusion of impeachment evidence was harmless error where "that impeachment involved a subject which, while not collateral in nature, neither bore directly on an element of the offense or a matter at issue in the cause"); *Washington v. State*, 840 N.E.2d 873, 885 (Ind.Ct.App.2006) (holding exclusion of alibi evidence was harmless error where "even with [the excluded] testimony it was possible [the defendant] could still have [committed the crime]"), *trans. denied; Doss v. State*, 536 N.E.2d 516, 518 (Ind.Ct.App.1989) (holding harmless the exclusion of witness's statement in a police report where the "statement was not submitted to prove any fact stated therein, but merely to color the police officer's testimony"); *Parke County v. Ropak, Inc.*, 526 N.E.2d 732, 740–41 (Ind.Ct.App. 1988) (concluding any error in exclusion of letter was harmless; although letter could have been used to impeach a witness, the impeachment concerned an issue separate from that on which the plaintiff brought its misrepresentation claim), *trans. denied; Lafary v. Lafary*, 522 N.E.2d 916, 917 (Ind.Ct.App.1988) (holding the erroneous exclusion of evidence establishing the existence of a contract did not cause substantial prejudice, as the determinative issue was not whether a contract existed, but whether the parties would be bound by an agreement if one existed); *Armstrong v. Azimow*, 118 Ind.App. 213, 216–17, 76 N.E.2d 692, 694 (1948) (concluding that even if the trial court erroneously refused to admit evidence, such error was harmless as "the inquiry was collateral"); *I. Duffey & Son Co. v. Kemmer*, 110 Ind.

---

**8.** We note the rule that a party may not elicit testimony on cross-examination on a collateral matter and then use that testimony to introduce impeachment testimony. *See Kien v. State*, 782 N.E.2d.2d 398, 409 (Ind.Ct.App. 2003) ("A party may inquire into a collateral matter on cross-examination. However, the questioner is bound by the answer received and may not impeach the witness with extrinsic evidence unless the evidence would be independently admissible." (citation omitted)), *trans. denied.*

App. 116, 37 N.E.2d 274, 276 (1941) (holding that erroneous exclusion of evidence was not reversible error where the evidence does not go to a matter determinative of the issue). The underlying theme of these decisions is that certain issues, although relevant, do not go to the heart of the matter and should not be the basis for corrective relief if error occurs relating to these issues. *See also Benson v. State,* 762 N.E.2d 748, 752 (Ind.2002) ("Errors arising from a prosecutor's attempts to impeach a witness by asserting unsubstantiated collateral matters are subject to a harmless error analysis"); *Henderson v. State,* 544 N.E.2d 507, 510 (Ind.1989) (declining to find fundamental error based on prosecutor's comment that the defendant was the only person who could speak directly on a point, where that point "had nothing to do with [the defendant's] guilt or innocence or the facts and circumstances of this case"); *Kelley v. State,* 482 N.E.2d 701, 703 (Ind.1985) (holding that although eyewitness's testimony was uncertain, "the uncertainty regards collateral matters" and was therefore sufficient, along with other circumstantial evidence, to sustain a conviction); *Stevenson v. Stevenson,* 173 Ind.App. 495, 504, 364 N.E.2d 161, 166–67 (1977) (holding erroneous admission of hearsay was harmless where evidence "would not be determinative" of the "central issue in this lawsuit"); *Sheridan v. Siuda,* 150 Ind.App. 395, 410, 276 N.E.2d 883, 891 (1971) (holding that erroneous giving of jury instruction was not grounds for reversal where instruction precluded jury from considering the defendant's violation of a ordinance and "the violation of this ordinance in no way bears upon [the ultimate issue of] whether or not [the defendant] was negligent"). We conclude Young's testimony impeaching Singh's claim that he performs physical examinations with a nurse in the room falls into this category of issues that should not be the basis for a new trial.

In sum, the Proposed Complaint did not, as the trial court found, "impeach [Singh's] incorrect response," appellant's app. at 11, as Singh's response was not incorrect. The Proposed Complaint does not contradict any claim made in Singh's counsel's opening statement. Although Young's testimony may contradict Singh's testimony in certain aspects, such contradiction went to an issue that was not dispositive of Singh's liability. Any error in exclusion could not have affected the Patients' substantial rights, and therefore, the grant of a new trial was improper. *See* Ind. Trial Rule 61 (recognizing that every court "*must* disregard any error ... which does not affect the substantial rights of the parties" (emphasis added)). We conclude this case presents one of the rare circumstances in which we must conclude the trial court abused its discretion in granting a new trial. The exclusion of the Proposed Complaint and Young's testimony simply did not cause prejudice to the Patients such as to dispense with the jury's verdict and require Singh to defend against the Patients' allegations anew.

## II. Singh's Motion for Judgment on the Evidence

Although we reverse the trial court's grant of a new trial and reinstate the jury verdict in favor of Singh, we note that in the Patients' motion to correct error, the Patients stated a completely separate ground for relief—newly discovered evidence. As the trial court granted the Patients' motion to correct error based on its rulings regarding the admissibility of evidence, it did not address this proffered ground for relief in its order. Therefore, as the trial court may address this ground on remand, we will address Singh's argument that the trial court improperly de-

nied his motion for judgment on the evidence.

### A. Standard of Review

"Where all or some of the issues in a case tried before a jury ... are not supported by sufficient evidence ... the court shall withdraw such issues from the jury and enter judgment thereon." Ind. Trial Rule 50(A). "The purposes of a motion for judgment on the evidence is to test the sufficiency of the evidence." *Stowers v. Clinton Cent. Sch. Corp.*, 855 N.E.2d 739, 747 (Ind.Ct.App.2006), *trans. denied.* A trial court enjoys broad discretion in ruling on a motion for judgment on the evidence, and we review a trial court's decision for an abuse of that discretion. *Luphahla v. Marion County Sheriff's Dep't*, 868 N.E.2d 1155, 1157 (Ind.Ct.App.2007). We will review a trial court's ruling on a motion for judgment on the evidence using the same standard as the trial court, looking only to the evidence favorable to the non-movant and making all reasonable inferences from that evidence. *Id.*

### B. Propriety of Trial Court's Denial of Singh's Motion

At the close of his evidence, Singh moved for judgment on the evidence pursuant to Indiana Trial Rule 50(A)(2). Singh argued that the Patients had failed to present expert testimony on the issue of proximate cause. The trial court denied the motion, stating:

> As respects to causation, that's an issue for the jury, but I think that in this particular situation this is not the kind of medical situation where you absolutely have to have expert testimony on

causation because the plaintiffs themselves know their own—how they felt and how their mental condition deteriorated as a result of this conduct, if it happened, and they've testified to it, so there is sufficient evidence to go the jury, so both motions will be denied[.]

Tr. at 610.

To hold a defendant liable for a plaintiff's injury, "the defendant's act or omission must be deemed to be a proximate cause of that injury." *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1243 (Ind.2003). Proximate cause involves two inquiries: 1) whether the injury would not have occurred but for the defendant's negligence; and 2) whether the plaintiff's injury was "reasonably foreseeable as the natural and probable consequence of the act or omission." *Id.* "When the issue of cause is not within the understanding of a lay person, testimony of an expert witness on the issue is necessary." *Daub v. Daub*, 629 N.E.2d 873, 878 (Ind.Ct.App.1994), *trans. denied; see also Topp v. Leffers*, 838 N.E.2d 1027, 1033 (Ind.Ct.App.2005), *trans. denied; Dughaish v. Cobb*, 729 N.E.2d 159, 164 (Ind.Ct.App.2000), *trans. denied; Schaffer v. Roberts*, 650 N.E.2d 341, 342 (Ind.Ct.App.1995) ("It is well settled that in a medical negligence claim, the plaintiff must prove by expert testimony not only that the defendant was negligent, but also that the defendant's negligence proximately caused the plaintiff's injury.").[9] An exception to this general rule is that "where the negligence and harmful results are sufficiently obvious as to lie within common knowledge, a verdict may be sup-

---

9. Our supreme court explicitly declined to rule on the issue of whether expert testimony is necessary to prove causation, but noted the holdings of this court to that extent. *See Bader v. Johnson*, 732 N.E.2d 1212, 1218 n. 6 (Ind.2000). We note that there appears to be a general consensus that expert testimony on causation is normally required. *See* 13 A.L.R.2d 11 § 5(a) ("Since the cause of the injuries ordinarily involved in malpractice actions are determinable only in the light of scientific knowledge, it has been recognized that expert testimony is usually necessary to support the conclusion as to causation.").

ported without expert testimony." 13 A.L.R.2d 11 § 5(b). Indiana courts have explained that this exception will not apply where injuries are "subjective," that is, "not directly observable by any of [the patient's] doctors." *Topp*, 838 N.E.2d at 1033; *Daub*, 629 N.E.2d at 877. Further, where there are pre-existing injuries, "discerning the causal connection between [the alleged malpractice] and [the patient's] resulting injuries is a complicated medical question that is not within the understanding of a lay person." *Topp*, 838 N.E.2d at 1033; *Daub*, 629 N.E.2d at 877. We have further explained that expert medical testimony is necessary "when the question involves the delicate inter-relationship between a particular medical procedure and the causative effect of that procedure upon a given patient's structure, endurance, biological makeup, and pathology. The sophisticated subtleties of the latter question are not susceptible to resolution by resort to mere common knowledge." *Malooley v. McIntyre*, 597 N.E.2d 314, 319 (Ind.Ct.App.1992).

We first turn to the question of whether expert testimony on causation is required in a case of alleged sexual misconduct by a psychiatrist, or whether such a situation falls into the "common knowledge" exception. No case in Indiana has addressed this issue. However, research has disclosed that two courts have addressed substantially similar situations; both courts concluded that expert testimony is required.

In *Hare v. Wendler*, 263 Kan. 434, 949 P.2d 1141 (1997), a patient brought a medical malpractice action against his psychiatrist, alleging that the psychiatrist had caused emotional injuries by engaging in sexual relations with the patient and then terminating the patient's treatment. The Kansas supreme court noted that the patient in that case had pre-existing conditions, thereby "complicat[ing] the question of whether his later hospitalizations for mental problems were attributable to [the doctor's] alleged sexual misconduct." *Id.* at 1148. The court concluded, "[d]espite the obvious impropriety of [the doctor's] alleged sexual misconduct and breach of the standard of care, the causation issue is too complex to fit within the common knowledge exception and is beyond the capability of a lay person to decide." *Id.*

In *Carmichael v. Carmichael*, 597 A.2d 1326 (D.C.1991), a patient brought a malpractice action against her psychologist, who had sexual relations with her and then convinced her to divorce her husband and marry the psychologist. The patient presented expert testimony regarding the applicable standard of care and the inappropriateness of sexual conduct between a therapist and patient, but failed to present expert testimony on causation. *Id.* at 1329–30. The court noted that "[t]he issue of whether [the patient's] problems stemmed from [the psychologist's] malpractice, as opposed to other factors, 'present[s] medically complicated questions due to multiple and/or preexisting causes,' requiring expert testimony on the issue of causation." *Id.* at 1329. The D.C. Court of Appeals later relied on its earlier decision in *Carmichael* in stating that a patient who had filed a malpractice claim against her chiropractor based on an alleged sexual relationship must present expert testimony on causation. *See McCracken v. Walls–Kaufman*, 717 A.2d 346, 353 (D.C. 1998) (holding that the patient had alleged facts sufficient to withstand a motion to dismiss, but recognizing that the patient would be required at trial "to adduce expert testimony that establishes, to a reasonable degree of medical certainty, that the injuries claimed by [the patient] were proximately caused by [the doctor's] breach of an applicable standard of care").

As in *Carmichael* and *Hare*, the Patients in this case all had pre-existing conditions, and other factors, such as drug use, could conceivably have contributed to their current symptoms. We agree with the Kansas and D.C. courts' analysis, which we find to be consistent with the general rules, and our own caselaw, on the issue of requiring expert medical testimony on causation. We therefore conclude that the Patients were required to present expert testimony on the issue of whether Singh's alleged misconduct was a proximate cause of their alleged injuries or symptoms.

The Patients argue that they did introduce expert testimony on the issue of causation. Upon our review of the transcript,[10] we must disagree. The Patients called Dr. Patrick Dennis Brophy,[11] who had met with the Patients. On direct examination, Dr. Brophy testified regarding the following: 1) in general, the harm caused when psychologists or psychiatrists have sexual relations with their patients; 2) general information regarding the "transference phenomena," whereby a patient "starts to transfer emotions that they may have for their parents or significant others ... to the therapist," *id.* at 217, and "counter-transference," whereby the therapist has either positive or negative thoughts about the patient as an individual, and not merely a patient;[12] 3) that the Patients are "vulnerable to being exploited by individuals," tr. at 220; 4) that the Patients problems were "consistent in situations where there have been boundary violations by health providers," *id.* at 224;

and 5) the extent of the problems faced by the Patients. On cross, Dr. Brophy clarified that his objective when meeting with the Patients "was to determine if I felt they were believable if they have been abused." *Id.* at 244. Most telling is the following exchange that occurred between Dr. Brophy and Singh's counsel:

Q: So you can't really tell us anything about how ill [the Patients] were in terms of a psychological sense prior to seeing Doctor Singh?

A: No.

Q: And you can't really tell us then in comparison to what you think Doctor Singh's actions were, what that added or change of that whole complex, can you?

A: No, I can't.

Q: You mentioned for instance, the fact that one of them had gained a hundred pounds, are you suggesting that that was because of depression?

A: I really don't know what it was because of. She told me that she had gained about a hundred pounds, and I assume it was a mood disorder.

Q: If it was related to depression, you can't say whether or not that was caused entirely by Doctor Singh and if so, what it was, to what degree, can you?

A: *I've not been asked what the proximate cause was.*

*Id.* at 260 (emphasis added). On redirect, Patients' counsel questioned Dr. Brophy about the Patients' credibility, but elicited no testimony regarding proximate cause.

---

10. Patients again have failed to cite to specific portions of the record, and we again admonish the Patients regarding their failure to support their factual allegations with citations to the record. *See, supra,* note 6.

11. Dr. Brophy is not a medical doctor, but holds a Ph.D. and is a professor of psychology.

12. For a more in-depth discussion of the transference phenomenon and its treatment by courts, *see Dillon v. Callaway,* 609 N.E.2d 424, 426–27 (Ind.Ct.App.1993) (citing *St. Paul Fire & Marine Ins. Co. v. Love,* 459 N.W.2d 698 (Minn.1990)), *trans. denied.*

Although Dr. Brophy testified regarding the standard of care, this issue is distinct from the issue of proximate cause. *See Carmichael*, 597 A.2d at 1329; *cf. Carter v. Indianapolis Power & Light Co.*, 837 N.E.2d 509, 520 (Ind.Ct.App.2005) (finding it unnecessary to determine whether the defendant met the applicable standard of care because any breach of duty did not proximately cause the injury), *trans. denied.* We cannot think of a clearer indication that an expert has not provided sufficient testimony on causation than the expert directly stating that he has not been asked questions regarding proximate cause. We therefore conclude that the Patients failed to provide expert testimony on proximate cause.

 Based on the Patients' failure to introduce expert medical testimony on the issue of causation, we conclude that the trial court's decision to deny Singh's motion for judgment on the evidence regarding the Patients' medical malpractice and gross negligence claims was clearly erroneous. The question remains, however, as to whether expert medical testimony was required on the Patients' battery claim.[13] We conclude that it is not.

 One is liable for the tort of battery if "(a) he acts intending to cause a harmful or offensive contact with the person of the other or third person, or an imminent apprehension of such contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind.2007) (quoting Restatement (Second) of Torts § 13 (1965)). "A touching, however slight, may constitute an assault and battery." *Knight v. Ind. Ins. Co.*, 871 N.E.2d 357, 362 (Ind.Ct.App.2007).

Although the jury found insufficient evidence that Singh committed battery, there was sufficient evidence introduced at trial to support such a finding. Singh is not absolved of liability because of his status as a psychiatrist at the time the alleged batteries occurred.[14] Although, as discussed above, the Patients failed to introduce sufficient evidence of causation of the Patients' injuries by Singh's malpractice or negligence *as a therapist,* this does not mean they failed to introduce sufficient evidence of causation of injury flowing directly from the battery. *See Symon v. Burger*, 528 N.E.2d 850, 852 (Ind.Ct.App. 1988) (recognizing that "all damages directly attributed to the wrong done are compensable"). The extent to which the Patients would be able to prove damages is an issue that we need not address at this point, as no damages have been awarded. However, we point out that damages are not foreclosed, and remand is therefore not futile, as "wherever there is a wrong, there is a remedy to redress it; and that

13. For clarification, as we conclude that the trial court should have granted Singh's motion for judgment on the evidence on the Patients' claims of medical malpractice and gross negligence, even if the trial court grants the Patients' motion to correct errors on the grounds of newly discovered evidence, the Patients would be allowed to proceed solely on their claim for battery. As none of the newly discovered evidence constitutes expert testimony on causation, none of this evidence would remedy the sufficiency problem present at the Patients' initial trial. Therefore, as this newly discovered evidence would not produce

a different result at retrial, the Patients will be unable to retry their malpractice and gross negligence claims. *See Taylor v. State*, 840 N.E.2d 324, 330 (Ind.2006) (recognizing that newly discovered evidence will warrant a new trial only when nine factors, including that the evidence "will probably produce a different result at retrial," are met).

14. We emphasize that the undisputed evidence at trial indicates that the acts alleged by the Patients do not constitute legitimate medical practice.

every injury imports damage in the nature of it; and, if no other damage is established, the party injured is entitled to a verdict for nominal damages." *Ross v. Thompson,* 78 Ind. 90, 1881 WL 7091 at *4 (1881) (quoting *Webb v. The Portland Mfg. Co.,* 3 Sumner 189 (C.C.Me.1838) (Story, C.J.)); *see also Turner v. Huibregtse,* 421 F.Supp.2d 1149, 1153 (W.D.Wis.2006) (holding that if the plaintiff could show he was sexually assaulted during a strip search, but could not show physical injury, "he will not be entitled to compensatory damages but may be entitled to other forms of recovery, such as nominal and punitive damages"); *Bonner v. Roman Catholic Diocese of Boise,* 128 Idaho 351, 913 P.2d 567, 568 (1996) ("An act of sexual abuse is a battery and entitles the victim to at least nominal damages in a suit filed immediately following the act."); *A.R.B. v. Elkin,* 98 S.W.3d 99, 104 (Mo.Ct.App.2003) (recognizing that although the plaintiff had not introduced medical evidence of emotional injuries, "[w]hether or not an injury is proven, a plaintiff is at least entitled to nominal damages upon a finding that an assault and battery occurred," and that the plaintiff "may also recover compensatory damages for bodily pain, humiliation, mental anguish and other injuries that occur as a necessary and natural consequence of the tortious conduct").

### Conclusion

We conclude the trial court improperly denied Singh's motion for judgment on the evidence on the Patients' claims for medical malpractice and gross negligence. We therefore remand with instructions that the trial court enter judgment on the evidence in favor of Singh on these claims. We also conclude the trial court abused its discretion in granting a new trial based on its decisions to exclude evidence at trial. We therefore remand with instructions that the trial court reinstate the jury's verdict in favor of Singh on the Patients'

claim for battery. The issue of newly discovered evidence raised in the Patients' motion to correct errors, which the trial court may address on remand, does not affect the insufficiency of the evidence presented at trial to support the Patients' claims of medical malpractice and gross negligence. *See, supra,* Part II; *see also, supra,* note 13. Therefore, if the trial court chooses to grant the Patients' motion to correct error based on their claim of newly discovered evidence, it should order a new trial on only their battery claim.

Reversed and remanded.

BAKER, C.J., and RILEY, J., concur.