## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 19 2019, 9:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Sean C. Mullins
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tiffany A. McCoy
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Luis Angel Mendoza, | July 19, 2019 |
| *Appellant-Defendant,* | Court of Appeals Case No. 18A-CR-3016 |
| v. | Appeal from the Lake Superior Court |
| State of Indiana, | The Honorable Salvador Vasquez, Judge |
| *Appellee-Plaintiff* | Trial Court Cause No. 45G01-1602-FB-1 |

**May, Judge.**

[1] Luis Angel Mendoza appeals his convictions of Class B felony child molesting[1] and Class C felony child molesting.[2] He raises one issue on appeal, which we restate as whether the trial court committed reversible error by allowing limited testimony regarding Mendoza's relationship with an underage family member other than the victim. We affirm.

## Facts and Procedural History

[2] Mendoza is approximately seven years older than J.R., and they have known each other for J.R.'s entire life. They are cousins and interacted frequently at family gatherings. When J.R. was six years old, Mendoza made him look at pornographic pictures and videos. When J.R. was eight years old, Mendoza began sexually touching J.R. This behavior continued until J.R. was twelve.

[3] J.R. testified about one incident that occurred when he was eleven and Mendoza was eighteen. Mendoza and his immediate family came to visit J.R. and his immediate family to see J.R.'s newborn baby brother. While the rest of the family was in the living room observing J.R.'s brother, Mendoza and J.R. went to J.R.'s brother's bedroom. Mendoza directed J.R. to perform oral sex on him, and J.R. complied. They stopped when they heard J.R.'s stepmother coming down the hallway.

---

[1] Ind. Code § 35-42-4-3(a) (2011).

[2] Ind. Code § 35-42-4-3(b) (2011).

[4] Another incident occurred when Mendoza spent the night at J.R.'s house. J.R. was in his room sleeping when Mendoza woke him and told him to come to the living room. J.R. followed Mendoza to the couch. While on the couch, Mendoza used his finger or his penis to penetrate J.R.'s anus. J.R.'s stepmother woke up. She noticed J.R.'s bedroom door was open and began to look for him. When Mendoza heard that J.R.'s stepmother was up, Mendoza pushed J.R. behind him, covered J.R. with a blanket, and laid on top of J.R. J.R.'s stepmother asked Mendoza if he had seen J.R., and Mendoza responded that he had not. J.R.'s stepmother continued to look for J.R. throughout the house. When J.R.'s stepmother said she was going to call the police because she could not find J.R., Mendoza pulled the covers off J.R. and said he was in the living room.

[5] J.R. also testified that Mendoza would fondle him underneath his pants while they played video games, including while J.R.'s sister was in the room watching them play the games. Years later, J.R.'s stepmother and his mother asked J.R. about his relationship with Mendoza, and J.R. told them Mendoza molested him. The family notified law enforcement. On February 29, 2016, the State charged Mendoza with three counts of child molesting.

[6] Beginning on October 22, 2018, the trial court held a three-day jury trial. Following voir dire and before recessing for the evening after the first day, the parties discussed—outside the presence of the jury—the manner in which to address allegations made by W., a cousin of both J.R. and Mendoza, against

Mendoza and pending criminal charges against Mendoza connected to W.'s allegations. During that discussion, Mendoza's counsel stated:

> So our defense is based on the fact that W. and [J. R.] get caught and, you know, they both describe how they're not gay and their cousin, [Mendoza], was making them do this because they were molested many years prior to that. And so that's where this whole situation comes from. So my biggest point is I do want to talk about that, but at the same time, I want [Mendoza] to have that protection where people aren't finding out about other criminal charges and allegations. And it's . . . very complicated and—the allegations and those instances in our defense kind of get braided up with each other. So it becomes—definitely going to avoid opening up the door to any charges that my client is facing against W. because I think that would prejudice the jury for sure. But I don't know if I'm going to be able to tell the story about these allegations without the State being able to talk about W. also making those allegations, and I don't know if—I don't know if that's even possible.

(Tr. Vol. II at 127-128.) In response, the State indicated that allowing Mendoza to advance his blame shifting theory without letting the State elicit testimony related to allegations that Mendoza molested W. "hamstrings the State's ability to attack the defense." (*Id.* at 129.) The trial court noted admissibility would depend on how the evidence was presented but did not make a ruling.

[7] The next day, prior to opening arguments, Mendoza made an oral motion in limine seeking to exclude information in an East Chicago police report regarding sex offenses Mendoza allegedly committed against W. The trial

court granted Mendoza's motion and noted that, if the issue arose during trial, the court would put the trial on hold and allow the prosecution to make an offer of proof. During opening statement, Mendoza's counsel referenced J.R.'s relationship with W. several times:

> [T]his case started out because the family finds out and this is a religious family, [Mendoza] is—I'm not going to say he's an outcast, but he's somewhat different than everybody. He's gay. Everybody knows he's gay. He has a boyfriend, but what everybody finds out in the family is that [J.R.] and his cousin that are months apart were having sex. Two boy cousins, W. and [J. R.], were having intercourse. So when confronted by that, that's when this allegation comes forward. That's when [J.R.] says oh, my gay cousin molested us. That's how these allegations started. That's what these allegations are about.

> \* \* \* \* \*

> Who is trying to give—well, they are giving reasons well, we were only hooking up. W. and [J. R.] as 14- and 15-year-old boys. We are not gay. [Mendoza] molested us. That's what this case is about. People trying to shift blame. They don't want to be outed.

> \* \* \* \* \*

> That's not right. It's not appropriate and that's what this case is about. You have someone who said this when he was confronted about having sex with his 15-year-old cousin. Depending on when this happened and timeframe. He's confronted and he blames [Mendoza]

> \* \* \* \* \*

> This is all something that when confronted with an awkward situation, [J.R.] blames [Mendoza]. Doesn't want to be outed. Doesn't want to be rejected by his religious family.

(Tr. Vol. III at 22-23, 26-27.)

[8] During a sidebar after Mendoza's opening argument, the State made an offer of proof stating the defense "opened the door" regarding the allegations involving W. and Mendoza and that the State wished to ask J.R. about whether he knew of W. and Mendoza's relationship. (*Id*. at 27-28.) The court granted the State's request and Mendoza entered a continuing objection.

[9] At the end of the State's direct examination of J.R., the following exchange occurred:

> Q [J.R.], at some point, did you talk to [Mendoza] or did [Mendoza] talk to you about his relationship with W.?
>
> A Yes.
>
> Q And did [Mendoza] ever tell you that [Mendoza] had any sexual relationship with W.?
>
> A Yes.

(*Id*. at 46-47.) During cross-examination of J.R., Mendoza asked:

> Q: Thank you. So you never tell anybody anything about this until you are accused of having a sexual relationship with W., right?

A: Yes.

Q: That is what came up first, the relationship with W., correct, not [Mendoza], correct?

A: No.

Q: What happened?

A: It was [Mendoza] first.

Q: Who asked you about [Mendoza] first?

A: My Mom and my stepmom.

* * * * *

Q: So the story that you are telling us is that [Stepmother] and [Mother] asked you—first started out their investigation into this—these cousins having sex with you. First thing they bring up is you and [Mendoza], right?

A: Yes.

Q: And not you and W.?

A: Yes.

(*Id*. at 48, 60-61.)

[10] The jury found Mendoza guilty of one count of Class B felony child molesting and of Class C felony child molesting, but it found him not guilty of the second count of Class B felony child molesting. The court entered judgments of conviction of Class B felony and Class C felony child molesting and sentenced Mendoza to an aggregate term of twelve years in the Indiana Department of Correction.

# Discussion and Decision

[11] Mendoza contends the trial court erred in admitting J.R.'s testimony that Mendoza told J.R. that Mendoza also had a sexual relationship with W. We evaluate a decision to admit or exclude evidence using an abuse of discretion standard because such decisions are within the trial court's "sound discretion" and are "afforded great deference" on appeal. *Fugett v. State*, 812 N.E.2d 846, 848 (Ind. Ct. App. 2014). We will reverse a decision to admit evidence only where the admission is a "manifest abuse of discretion by the trial court resulting in the denial of a fair trial." *Johnson v. State*, 831 N.E.2d 163, 168-69 (Ind. Ct. App. 2005), *trans. denied*. "A decision is an abuse of discretion if it is clearly against the logic and effect of the facts and circumstances before the court." *Id*. at 169.

[12] Mendoza argues the trial court improperly admitted this testimony in violation of Indiana Rule of Evidence 404(b), which controls the admissibility of "Crimes, Wrongs, or Other Acts" evidence and provides:

(1) *Prohibited uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses; Notice in a Criminal Case.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

> (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

This rule is meant to prevent the jury from drawing the forbidden inference that the defendant is guilty of the crime he stands accused of committing because the defendant committed crimes in the past. *Udarbe v. State*, 749 N.E.2d 562, 564 (Ind. Ct. App. 2001).

[13] In examining the admissibility of Rule 404(b) evidence, courts apply a two-prong analysis. *Wages v. State*, 863 N.E.2d 408, 410 (Ind. Ct. App. 2007), *reh'g denied*, *trans. denied*. "First, the court must assess whether the evidence has some relevancy to a matter at issue other than the defendant's propensity to commit the charged act. Second, the court must weigh the probative value of the evidence against its prejudicial effect, pursuant to Evidence Rule 403." *Id.* (internal citation omitted). By necessity, the court's analysis of the admissibility

of Rule 404(b) evidence includes the relevancy test of Rule 401 and the balancing test of Rule 403. *Maffett v. State*, 113 N.E.3d 278, 283 (Ind. Ct. App. 2018).

[14] Mendoza argues the evidence was admitted for the sole purpose of showing Mendoza's propensity for child molesting because Mendoza did not put his motive or intent at issue. He further asserts any probative value is substantially outweighed by the danger of unfair prejudice. In contrast, the State contends Mendoza's opening statement served to "open the door" to admission of the testimony and, regardless, the evidence was admissible for the purpose of contextualizing the relationships between all the individuals involved.

[15] As our Indiana Supreme Court has explained, "[o]therwise inadmissible evidence may be admitted where the defendant opens the door to questioning on that evidence." *Clark v. State*, 915 N.E.2d 126, 130 (Ind. 2009), *reh'g denied*. This occurs when otherwise inadmissible evidence is needed to correct a deceptively incomplete disclosure or to correct a false or misleading impression of the facts. *Valdez v. State*, 56 N.E.3d 1244, 1249 (Ind. Ct. App. 2016), *trans. denied*. While an opening statement is not evidence, "counsel may open the door to permit the admission of otherwise inadmissible evidence through an opening statement." *Singh v. Lyday*, 889 N.E.2d 342, 351 (Ind. Ct. App. 2008), *reh'g denied*, *trans. denied*. For example, in *Wilder v. State*, we held that testimony by a detective constituting a legal conclusion was admissible because the defendant opened the door to such testimony by attacking the sufficiency of the police investigation in his opening statement and during cross-examination of a

different police officer. 91 N.E.3d 1016, 1023 (Ind. Ct. App. 2018). We also held in *Terrell v. State* that while juvenile adjudications may not be used for impeachment purposes, the defendant opened the door to admission of his juvenile adjudication when his counsel said during opening statement that the defendant did not have any criminal history. 507 N.E.2d 633, 635 (Ind. Ct. App. 1987), *reh'g denied*, *trans. denied*.

[16] During his opening statement, Mendoza presented the theory that J.R. falsely accused him of molestation because J.R.'s family discovered his sexual relationship with W. and J.R. did not want his family to shun him because of that relationship. Mendoza's opening statement urged the jurors to wonder about the family dynamics between J.R., W., and Mendoza. Mendoza's counsel even referenced J.R. and W. in the plural form at one point during his opening statement. (Tr. Vol. III 23) ("W. and [J.R.] as 14- and 15-year-old boys. We are not gay. [Mendoza] molested us.") This statement gives the jury the impression that both W. and J.R. are blaming Mendoza for their own sexual relationship. It leads the jury to think both W. and J.R. are accusing Mendoza of molesting them. Thus, the State needed to question J.R. about his knowledge of W. and Mendoza's relationship to give the jury a complete and accurate understanding of the facts based on the impressions Mendoza's counsel left in his opening statement.

[17] J.R.'s knowledge of Mendoza's relationship with W. is relevant to a jury trying to decide between competing theories. As Mendoza even acknowledged after voir dire, the sexual relationship between J.R. and Mendoza is connected to the

sexual relationship between J.R. and W. Mendoza even attempted to derive testimony supporting his blame shifting theory by asking J.R. during cross-examination which sexual relationship he was questioned about by his mother and stepmother first, his sexual relationship with W. or his relationship with Mendoza. Additionally, during re-cross-examination following a jury question about J.R.'s sexual relationship with W., Mendoza asked "You were having sex or W. was having sex with you when you were six?" J.R. answered, "No. It wasn't sex. We were touching each other because of what [Mendoza] did to me and him." (*Id*. at 68.) Mendoza contends J.R. is trying to shift blame for being caught having sex with W. However, J.R.'s testimony is that he was having sex with W. because of what Mendoza did to both him and W.

[18]    Limited testimony regarding J.R.'s knowledge of Mendoza's relationship with W. is relevant to assessing J.R.'s credibility. It enlightens the jury regarding the theory Mendoza posed in his opening statement. In fact, although Mendoza raised a continuing objection to 404(b) evidence, he acknowledged that some discussion of the relationship between J.R., W., and Mendoza was necessary. (*See id*. at 30) ("I assumed based on our defense that this Court would allow that stuff in just. . . . So I think a lot of that stuff just has to come in."). We agree with the State that, given Mendoza's theory of the case, he opened the door to the limited introduction of evidence regarding J.R.'s knowledge about W.'s sexual relationship with Mendoza. *See Wales v. State*, 768 N.E.2d 513, 521 (Ind. Ct. App. 2002) (holding defendant opened the door to admission of 15-

year-old robbery conviction), *clarified on reh'g* 774 N.E.2d 116 (Ind. Ct. App. 2002), *trans. denied*.

# Conclusion

[19] The theory of the case Mendoza presented during his opening statement opened the door to questioning of J.R. regarding his knowledge of the relationship between W. and Mendoza. Therefore, we do not need to assess whether the testimony was admissible pursuant to Indiana Rule of Evidence 404(b). The trial court did not abuse its discretion in allowing such testimony. We affirm Mendoza's convictions.

[20] Affirmed.

Mathias, J., and Brown, J., concur.