**In re the MARRIAGE OF Robert J. BLANFORD, Appellant–Petitioner,**

**and**

**Judy D. Blanford, Appellee–Respondent.**

**No. 65A01–1004–DR–181.**

Court of Appeals of Indiana.

Nov. 10, 2010.

**7.** At the conclusion of the March 30 hearing, the trial court set another status hearing for June 15, 2009.

Keith W. Vonderahe, Clay W. Havill, Ziemer, Stayman, Weitzel & Shoulders, Evansville, IN, Attorneys for Appellant.

Scott A. Danks, Danks & Danks, Evansville, IN, Attorney for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Robert J. Blanford ("Robert") appeals from the trial court's denial of his Motion to Correct Error, which challenged the trial court's determination of his child support obligations and the disposition of a 401(k) plan.

We affirm in part, reverse in part, and remand for further proceedings.

### Issues

Robert presents three issues for our review, which we restate as whether the trial court erred when it:

    I.  Calculated Robert's child support obligations using separate worksheets for each of his two children;

    II.  Required Robert to pay certain expenses related to his elder child's post-secondary education; and

    III.  Ordered that the 401(k) account maintained by Robert would be equally divided between the two

children upon his younger child's completion of a bachelor's degree.

### Facts and Procedural History

Robert and Judy (Blanford) Butler ("Judy") were divorced in 1998. They have two children, M.B. and S.B. As part of the divorce settlement, a 401(k) shared by Robert and Judy was designated as a marital asset to be safeguarded for use in paying the children's college education expenses. In addition, prior to the divorce Robert obtained shares of stock in General Electric, which Judy's father placed into an investment account for M.B. Robert managed the account on M.B.'s behalf, and at some point Robert took M.B.'s name off of the account but continued to manage the assets.

At the time of the proceedings at issue, M.B. and S.B. were seventeen and fifteen, respectively. Sometime around Father's Day in 2008, M.B.'s relationship with Robert deteriorated. Robert believed this stemmed from costs related to automobile insurance for M.B. and whether M.B. was permitted to drive to Robert's home or to work. M.B. later told a Guardian Ad Litem ("GAL") that his concerns centered on being put in the middle of Robert's and Judy's disputes over parenting time and child support and concerns with Robert's second wife, Julie. During 2008 and 2009, S.B. began to spend more time with Robert and expressed an interest in increasing his overnight parenting time with Robert.

On July 21, 2008, Judy filed a motion seeking an increase in Robert's child support obligations. On October 17, 2008, the trial court temporarily increased Robert's support obligations and required Robert and Judy to select a Guardian Ad Litem to investigate the relationships among themselves and M.B. On April 8, 2009, Judy filed an information for contempt against Robert. On July 20, 2009, Robert filed a motion for modification of parenting time, support, and custody and an information for contempt against Judy. The trial court held a hearing on the motions on December 17, 2009, twice continuing the hearing to December 12, 2009, and January 5, 2010.

After hearing the evidence and in camera discussions with M.B. and S.B., the trial court entered its order on January 20, 2010. The court held that neither Robert nor Judy was in contempt. It also adjusted Robert's overnight parenting time with M.B., determining that Robert would have no overnight parenting time with M.B. due to the deterioration of their relationship, and with S.B., increasing Robert's overnight parenting time to 182 days per year.

The trial court also modified Robert's support obligations at this time, setting three different amounts for three different periods of time: one for the period from the entry of the temporary order in 2008 to the date of the January 2010 order, one for the period from the date of the January 2010 order until M.B. was to leave for college, and one for the period after M.B.'s expected departure. Robert was also found to be in arrears as a result of the temporary order's underestimation of his support obligations, and Robert was ordered to satisfy this arrearage. The trial court also required Robert, Judy, and each of the children to share certain expenses related to college education, subject to reduction by scholarship and other sources of funding.

Finally, the trial court specified the disposition of certain assets. It ordered that, upon S.B.'s completion of a bachelor's degree, the remaining assets in the 401(k) be divided equally between M.B. and S.B. It also ordered that the stock account held by Robert be dedicated in its entirety to payment of M.B.'s education expenses.

On February 18, 2010, Robert filed his Motion to Correct Error. The trial court removed a requirement that Robert provide for certain vehicle-related expenses as part of the provision for the children's educational expenses, but left standing the portions of its order that modified Robert's support obligations and allocated the 401(k) to the children.

This appeal followed.

Additional facts will be introduced as required.

## Discussion and Decision

### *Standard of Review*

■ Robert appeals from the trial court's denial of parts of his Motion to Correct Error. We review such denials for an abuse of discretion, which occurs when the trial court's decision is against the logic and effects of the facts and circumstances before it, together with inferences which can be drawn from these. *Singh v. Lyday*, 889 N.E.2d 342, 348 (Ind. Ct.App.2008), *trans. denied.* Where the underlying asserted errors have separate standards of review, we note them below.

### *The Trial Court's Calculation of Child Support Obligations*

■ Robert challenges the trial court's determination of his support obligations on two grounds. He argues first that the trial court should have used only one Child Support Worksheet to calculate his support obligations. He then argues that, in calculating his parenting time credit on the Child Support Worksheet, the court should have averaged the number of overnight visits per year between the two children.

■ A trial court's determination of child support obligations is presumptively valid and given broad deference upon appeal. *Young v. Young*, 891 N.E.2d 1045, 1047 (Ind.2008) (citations omitted). We reverse such decisions only where they are clearly erroneous or contrary to law. *Id.* A decision is clearly erroneous when it is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* A trial court has the discretion to diverge from that result when the evidence leads the trial court to conclude that the guideline amount would be unjust. Ind. Child Support Rule 3. When a trial court does diverge from the guidelines, it must explain its reasons for doing so in writing. *Id.*; also Ind. Child Support Guideline 3(F), Commentary ("[i]f the court determines that the Guideline amount is unjust or inappropriate, a written finding shall be made setting forth the factual basis for deviation from the Guideline amount. A simple finding . . . is sufficient.")

■ The Guidelines anticipate that trial courts will use one Worksheet for all the children in a family. Robert takes issue with the trial court's use of two Child Support Worksheets to determine the total amount of his child support obligation to be paid to Judy, noting that the use of two worksheets led to the trial court making two support calculations—one for each child—rather than using a single worksheet with a single support calculation, which inflated his basic child support obligation.

An examination of the Worksheets and calculation instructions in the Guidelines reveals the likely reason for the trial court's separate calculations. The Child Support Worksheet combines parental income and then uses the Support Schedules to determine the weekly basic support obligation based on the total number of children. It then credits the non-custodial parent for the number of overnight stays the children have with that parent per year. This credit is applied against the non-custodial parent's support obligation

for all of the children. Thus, the Guidelines presume that each child will have the same number of overnight stays with the non-custodial parent.

The circumstances in the Blanfords' case differ from the assumptions made by the Guidelines. The trial court found, after in camera interviews with the children, that M.B. would likely have no overnight parenting time with Robert, but that S.B. would have significant overnight parenting time with him—one worksheet presumes 182 days of overnight parenting time—and the court entered its order based on those findings. Given this difference in overnight parenting time between M.B. and S.B., the trial court could not have calculated Robert's support obligations for both children using the Guidelines and Worksheet as they currently exist. *See Hartley v. Hartley*, 862 N.E.2d 274, 286 (Ind.Ct. App.2007) (noting that "[t]he Child Support Guidelines offer no direction for calculating parenting time credit when a parent spends overnights with fewer than all of his children.").

Given this difficulty, the trial court used separate Worksheets for each child. This led to calculations that treated each child as though he was an only child for the purposes of calculating Robert's child support obligations. In challenging the trial court's calculation of his basic support obligation, Robert directs our attention to the Commentary on the Indiana Child Support Guidelines. The Commentary notes that "intact households" spend more money per child "as family income increases" and that, assuming constant income levels, such spending drops "for each child as family size grows." Child Supp. G. 1,

Commentary. "[T]he amount of support required for two children is 1.5 times that required to support one child." Child Supp. G. 4, Commentary.[1]

We agree with Robert that, by using two worksheets in this manner, the trial court deviated from the Guidelines' designated factor for calculating the basic support obligation for each additional child. The Worksheets used by the trial court have inflated the aggregate basic support obligation for M.B. and S.B. Under the Child Support Guidelines' Support Schedules, the basic weekly support obligation for one child at Robert's and Judy's combined income level is $273.00; for two children, the basic weekly support obligation is $410.00. The trial court's use of the separate worksheets doubled the underlying basic support obligation to an aggregate of $546.00—$273.00 for each of the two children—instead of fixing it at $410.00, which is 1.5 times $273.00, in keeping with the additional-child factor in the Guidelines and Support Schedules. This in turn inflated Robert's support obligations for each child, since the rest of the support calculations were performed against that inflated basic support obligation figure.

Robert urges that the trial court should have used one Worksheet with the basic support obligation as expressed in the Support Schedules. He then goes on to argue that the trial court should have averaged the total overnight parenting time credit between the two children, allowing the calculation to be performed on one worksheet. Thus, in the example Robert posed in his brief, rather than receiving credit for 182 days of overnight credit against his obligations for S.B. and no

1. While in context this statement explains why a new child support calculation must be performed upon the emancipation of a child, rather than simply reducing the obligor parent's support obligation *pro rata,* its logic is applied elsewhere. The most notable use of this factor is in the Child Support Schedules, which increase the basic weekly support obligation by 50% for each additional child.

overnight credit against his obligations for M.B., Robert would receive 91 days of overnight credit on one worksheet with one child support calculation accounting for two children.

This approach suffers from its own difficulties. In particular, the Parenting Time Worksheet used to determine the credit for overnight parenting time uses Table PT of the Guidelines to determine the multiplication factor used to calculate the amount of the credit given to the non-custodial parent. *See* Child Supp. G. 6, Commentary. Table PT includes a factor for duplicated expenses. By averaging the parenting time between the two children, Robert's suggested 91 days of overnight parenting time credit might extend Robert too much or too little credit in calculating his support obligations.

Given this situation, the trial court could not have applied the Guidelines and used the Worksheets as written. The trial court nonetheless erred on two grounds when it ordered the child support using the separate Worksheets.

First, neither S.B.'s nor M.B.'s worksheet is correct because each child was treated as though he was an only child. The trial court used two Worksheets to determine the support obligations for the children, and the basic support obligations were calculated separately as if each were an only child. The use of a different method of calculating the basic support obligation is inherently a deviation from the Guidelines.

This deviation is itself the root of the second error. The Order deviates from the Guidelines without explaining its reasons for doing so. *See* Child Supp. R. 3; Child Supp. G. 3(F), Commentary. Though the trial court made a finding that it did "not anticipat[e] that [M.B.] will choose to stay any overnights with the father," the Order states in several places that its support obligation calculations come "Pursuant to the Indiana Child Support Guidelines," even as the Order applies nonconforming basic support obligation calculations without further explanation. (Order 4.)

It may have been sufficient for the trial court to use the language from the Commentary to Guideline 3(F), "The court finds that the presumptive amount of support calculated under the Guidelines has been rebutted for the following reasons," and then provide reasons for the deviation. Absent findings that explain the court's reasoning, and given the unexplained approach to setting the basic support obligation, we cannot affirm the trial court because it has erred as a matter of law.

◼ Given the errors in the trial court's decision, we remand this issue to the trial court. Proper determination of the basic support obligation under the Schedules is crucial to the rest of the child support calculation. Thus, on remand, we direct the trial court to use one worksheet accounting for both children, rather than one worksheet for each child, and to use the Schedules' basic support obligation for two children at the appropriate weekly income level for Robert and Judy. The trial court should then calculate the overnight parenting time credit using the basic support obligation for two children, and may adjust the number of days of overnight credit to reach what appears to be an appropriate result for setting Robert's weekly support obligation. Because the Guidelines do not afford a basis on which to set the number of days of overnight credit, the trial court must explain the reasons for its use of the specific number of days of overnight credit in its order.

### *The Trial Court's Order for Payment of Educational Expenses*

Robert next identifies as an error the trial court's order that he contribute to

certain educational expenses associated with M.B.'s attendance at Purdue University. In particular, Robert claims that the trial court erred in designating the types of extraordinary educational expenses encompassed by the support order and in apportioning those expenses among himself, Judy, and M.B. Robert also urges that the trial court's failure to require a minimum grade point average of M.B. during his time at Purdue, the trial court's order that he be required to pay for educational expenses in light of his financial circumstances, and the trial court's lack of strict parameters for support when set against his lack of overnight parenting time with M.B. also each constitute error.

■■ When determining parental contributions for extraordinary educational expenses,

> [a] court may order a parent to pay part or all of a child's extraordinary educational costs when appropriate. Decisions to order the payment of these extraordinary educational expenses are reviewed under an abuse of discretion standard, while apportionment of expenses is reviewed under a clearly erroneous standard. Additionally, the trial court has discretion to determine what is included in educational expenses.

*In re Paternity of C.H.W.*, 892 N.E.2d 166, 171 (Ind.Ct.App.2008) (citations omitted), *trans. denied.* Thus we must consider whether the trial court abused its discretion in ordering the parents to pay those extraordinary expenses and whether, once ordered, the apportionment of the expenses was clearly erroneous.

Indiana Code section 31–16–6–2 establishes the trial court's authority to order parents to pay educational expenses as part of a child support order. For a child attending a postsecondary school, such an order must take into account the child's aptitude and ability to engage in such edu-cational activities; his ability to contribute to his own educational expenses through work, loans, or other financial aid available to the child and his parents; and the ability of the parents to meet these expenses. Ind.Code § 31–16–6–2(a)(1). When ordering educational support, the trial court must reduce any support for that child to the extent the educational support would duplicate other support that would be paid to the custodial parent. I.C. § 31–16–6–2(b).

Interpreting section 31–16–6–2, the Child Support Guidelines discuss what extraordinary educational expenses may be encompassed within a child support order. "Extraordinary educational expenses ... should be limited to reasonable and necessary expenses for attending ... institutions of higher learning ... to meet the particular educational needs of the child." Child Supp. G. 8. "A determination of what constitutes educational expenses will be necessary and will generally include tuition, books, lab fees, supplies, student activity fees and the like. Room and board will also be included when the student resides on campus...." Child Supp. G. 8(b). "The court may wish to consider in the category of 'Other' educational costs (Line B(5) of the Worksheet) such items as *transportation, car insurance, clothing, entertainment and incidental expenses.*" *Id.* (emphasis added).

■■ Robert assigns error to the trial court's decision that "[e]ach party and son shall equally contribute toward that son's post secondary educational costs including, without limitation ... cell phone, entertainment, food, athletic pass, and incidentals." In particular, Robert objects to " 'entertainment' and 'incidental' expenses," asserting that "there are no limitations" to Robert's obligations. (Appellant's Br. 15.)

We find no abuse of discretion in the court's designation of what constitutes appropriate extraordinary educational expenses. The trial court's determinations of what educational expenses are within the scope of the parents' support obligations closely follow the language of the Guidelines. *See* Child Supp. G. 8(b) (including "transportation, car insurance, clothing, entertainment and incidental expenses" in the types of costs that may be included in a child support order for extraordinary educational expenses).

As to the "without limitation" language in the Order, Robert's obligation is not unlimited. Rather, this language is present to avoid strict limitation of the types of expenses encompassed by the support order to the list specified. The order expressly limits "[t]he parties' respective contributions" to "1/3 of those costs charged by an in-state public university." (Order 5; Appellant's App. 17.) This language limits the total amount of Robert's obligation to a maximum of one-third of the sum of the cost of attendance at an in-state public university, of which Purdue University, where M.B. was admitted, is one.[2]

In addition, before any educational expenses are assessed against either parent, the postsecondary education costs for which Robert and Judy are responsible is to be reduced by numerous other sources of funds. Scholarships and other non-repayable aid (e.g. grants, work study) are applied against the total costs assessed by an in-state public university. After this, funds from the 401(k) are to be applied,

limited to one-eighth of the principal balance of the account. For M.B., the funds from a second account are also to be applied. Thus, before the parents themselves must make any contribution to their children's postsecondary educational expenses, several other sources of funding will reduce the total amount of the obligation to be shared among Robert, Judy, and each child. Accordingly, Robert will be assessed, at most, only one-third of the total cost of in-state university attendance—an amount readily ascertainable and certainly not "without limitation"—and scholarships and other sources of funds may well reduce Robert's obligations even further.[3]

■ Robert also argues that, given his financial circumstances, the trial court's imposition of college costs upon him is erroneous because he produced evidence that he cannot afford to pay. When assessing extraordinary educational expenses as part of a support order, the trial court "should ... take[e] into consideration the incomes and overall financial condition of the parents and the child." Child Supp. G. 8(b). Though the trial court's approach to calculating Robert's support obligations is erroneous, we note that the court's order takes into account the reduction in support costs associated with M.B.'s away-from-home attendance at Purdue. Thus, under both the flawed calculations made by the trial court and the corrected calculations to be made on remand, Robert's basic child support obligations will be reduced. This in turn will free some re-

2. One exhibit admitted into evidence during the hearing was a printout of a Web page from Purdue University listing the expenses associated with attendance for in-state students, including the costs of tuition, room and board, textbooks, transportation, entertainment, and incidentals. Thus, the total extent of Robert's obligation was readily determined

when taken with the one-third portion set forth in the order.

3. Robert's obligations for M.B. will already be limited to some extent by the 21st Century Scholars program scholarship that Robert and M.B., working together, were able to obtain.

sources to help defray the costs of college for M.B. that scholarships or the investment accounts may not cover. The reduction in child support was expected to "far exceed" the out-of-pocket expenses associated with M.B.'s attendance at Purdue. (Tr. 172.) Given the likely reduction in overall obligations, we cannot agree that the trial court erred in its consideration of Robert's ability to pay M.B.'s educational expenses as part of the support order.

We likewise find no error with the trial court's omission of a specific grade-point average requirement from its Order. Support Guideline 8(b) states that a trial court "should require that a student maintain a certain minimum level of academic performance," but there is no requirement that trial courts do so: "We encourage trial courts to set a minimum level of academic performance when appropriate.... [W]hether a minimum grade point average is appropriate and, if so, the precise level ... should be determined on a case-by-case basis." *Deckard v. Deckard*, 841 N.E.2d 194, 203 n. 6 (Ind. Ct.App.2006). Robert's own testimony before the trial court indicated that M.B. is a "[p]erfect student," (Tr. 9) and Judy testified that both M.B. and S.B. are "straight 'A'" students. (Tr. 140–41.) Given the evidence in the record of prior academic achievement by the children, we cannot say the trial court erred in omitting a specific academic achievement requirement from its order.

Finally, Robert also argues that, since he is not expected to have overnight parenting time with M.B., "some parameters" should have been placed upon Robert's obligation to pay for educational expenses. (Appellant's Br. 17.) As discussed above, the court's order is not without parameters as to the extent of Robert's obligation to pay for educational expenses, and the trial court did not err when it omitted a specific grade-

point average requirement. The trial court was within its discretion to draft the order as it did, even in light of the expected absence of overnight parenting time, because the absence of that time arose from a breakdown in communication between M.B. and Robert which Robert repeatedly expressed a desire to repair. Robert does not claim that M.B. has repudiated him, and did not make such a claim before the trial court. *See, e.g., Norris v. Pethe*, 833 N.E.2d 1024, 1032–35 (Ind.Ct.App.2005) (relieving noncustodial parent of obligation to pay college expenses for a repudiating child). Given Robert's testimony as to his desire to restore his relationship with M.B. and his claimed willingness to help defray college costs, we cannot say the trial court erred in setting the general boundaries of Robert's support obligations for M.B.'s education.

### The Trial Court's Order for Distribution of the 401(k)

Finally, Robert asserts that the trial court erred when it ordered that the balance of the 401(k) be apportioned between S.B. and M.B. after all college expenses have been paid for each of them.

Where marital property is disposed of through court order upon the dissolution of a marriage, that order "may not be revoked or modified, except in case of fraud." I.C. § 31–15–7–9.1(a). Our legislature "intends finality for dissolution decrees as they relate to the disposition of property." *Voigt v. Voigt*, 645 N.E.2d 623, 626 (Ind.Ct.App.1994), *trans. denied.* Moreover, "[a] property settlement which is incorporated into a final divorce decree is a binding contract. The dissolution court may not modify or revoke the settlement absent fraud, duress or undue influence." *Johnson v. Johnson*, 575 N.E.2d 1077, 1080 (Ind.Ct.App.1991) (citing *Smith v. Smith*, 547 N.E.2d 297, 300 (Ind.Ct.App.

1989)), *disapproved of on other grounds, Fackler v. Powell,* 839 N.E.2d 165 (Ind. 2005). This rule advances the policy of encouraging settlement agreements in dissolution proceedings. *Smith v. Smith,* 547 N.E.2d 297, 300 (Ind.Ct.App.1989).

Here, the trial court deviated from the 1998 Settlement Agreement, which provided that the 401(k) would be equally divided between Robert and Judy "[o]nce the younger of the parties' children has completed a maximum of a bachelor's degree." (Appellant's App. 42.) The trial court's order here calls for those funds to be divided between M.B. and S.B., and it denied Robert's request to adjust this disposition in his Motion to Correct Error. More than a decade after the entry of the original property settlement, the trial court has ordered a change in the distribution of marital assets and, in effect, undermined the parties' reliance on the settlement and dissolution decree. *See Voigt,* 645 N.E.2d at 626; *Smith,* 547 N.E.2d at 300. Thus the trial court's order is in error pursuant to section 31–15–7–9.1(a), as there has been no allegation or finding of fraud.

On remand, the trial court should strike its allocation of the 401(k) to M.B. and S.B., leaving the distribution of that asset as represented in the 1998 Settlement Agreement.[4]

## Conclusion

The trial court erred when it calculated Robert's child support obligations on two worksheets, treating each son as an only child without explanation of its reasons. This inflated the basic support obligation and caused calculation errors in the sup-

port calculations for each of the three time periods addressed in the support order. The trial court did not err in its determination and allocation of extraordinary educational expenses as part of Robert's support obligations related to M.B.'s and S.B.'s college education. The trial court erred in assigning the funds in the 401(k) to M.B. and S.B., rather than to Robert and Judy, upon S.B.'s completion of a bachelor's degree, because this assignment was a post-dissolution modification of the division of marital assets. We therefore affirm in part, reverse in part, and remand with instructions for recalculation of the support order and for the allocation of the 401(k).

Affirmed in part, reversed in part, and remanded.

RILEY, J., and KIRSCH, J., concur.

---

4. In his testimony before the trial court, Robert discussed separate investment account maintained by BNY Mellon Services that he intended to use for his sons' benefit. Robert expressed a desire that these funds be distributed between M.B. and S.B. equally to "help them get a start on the first month's rent of an apartment" after each graduated from college. (Tr. 15.) We suggest the trial court return to its order and determine whether it confused its intended treatment of the 401(k) and its intended treatment of the BNY Mellon Services account, which it ordered be given to M.B. in its entirety.